The State v. Overton H. Gentry, Jr., Appellant.—8 S. W. (2d) 20.

Division Two, June 21, 1928.

*T. C. Tadlock, Norman A. Cox* and *Hugh Dabbs* for appellant.

*Frank R. Birkhead,* Special Prosecutor, for respondent.

HENWOOD, C.—By an information filed in the Circuit Court of Jasper County, Overton H. Gentry, Jr. (appellant), and one Wilkins Taylor were jointly charged with the crime of rape. A severance was granted, and, upon a separate trial, Gentry was convicted and sentenced to imprisonment in the penitentiary for ninety-nine years, in accordance with the verdict of the jury. The case is here for review on his appeal.

Bertha Goen, the prosecutrix, testified, in substance, that, at the time in question, she was eighteen years of age, weighed between 98 and 100 pounds, and was employed as a domestic servant in the home of Mrs. Walter Jackson in the city of Joplin. About 5:30 on Wednesday afternoon, January 5, 1927, she went to Jamison's Drug Store to get some stamps and face powder. On her way back to the Jackson home, Thelma Gishner came up behind her and asked her to take a ride with her (Thelma Gishner) and two friends. She had met Thelma on the street before, and had gone to a show with her once or twice. After some hesitation, she consented, and Thelma took her back along the street a short distance, and introduced her to Gentry and Taylor, who were sitting in the front seat of a Buick Sedan, parked in front of the West Side Pharmacy. She had no previous acquaintance with Gentry or Taylor and had never seen either of them before. After they talked a few minutes, Thelma left, saying she would go to her friend's room and change her dress and come back for the ride. Gentry and Taylor asked her to get in the car, and, when she declined, Gentry got out, took her by the arm and shoved her toward the car, and she sat down on the front seat. Gentry then got in the front seat and closed the door of the car. She made no effort to get away and did not call for help. Presently, Taylor, who was driving, started the car, and said they would take a ride and come back for Thelma. At her request, they said they would drive by the Jackson home, and she could tell Mrs. Jackson that she would not be home for awhile. When Taylor failed to make the proper turn to go in the direction of the Jackson home and she told them she was going to get out, Gentry put his arm around her, pulled her down in the car, and held his hand over her mouth. She tried to get out, but made no outcry. She did not scream before Gentry put his hand over her mouth, because she "wasn't afraid of him." In this connection she said: "Well, I resisted as much as I could, but I couldn't do much; I was in such a position in the car that I couldn't do very much, but I resisted to the best of my ability." After they drove quite a distance north of Joplin, Taylor stopped the car and held her, with one arm around her and his hand over her mouth, while Gentry unlocked a gate. They drove through the gate, and off of the public road, to a house that looked like a shed. Gentry unlocked the house, went in, and lighted a lamp. She re-

fused to go in the house, and, when Taylor tried to take her out of the car, she resisted and screamed two or three times. Taylor took her into the house by taking hold of her arm and shoulder. She resisted, but was unable to escape. She tried to strike him, but "kicked more than anything else." They took her through the living room of the house and into a little room, where they put her on a bed. They took her clothes off and put them in the living room. First, Gentry, and then Taylor, attacked her, and had sexual intercourse with her, by force and violence and against her will. This continued, at intervals, from 6:30 or seven o'clock in the evening (after dark) until two or three o'clock in the morning. She resisted as much as she possibly could, but was unable to prevent it. She said Gentry had intercourse with her from twelve to fifteen times, and Taylor, from four to seven times. She said she meant they put their privates into hers that many times, and that she didn't know "how far that act went." After they had intercourse with her several times, Gentry held her while Taylor forced his privates into her mouth, and, when she resisted, Taylor burned her with a lighted cigarette and hit her with something and bruised her shoulder. She exhibited a scar from a burn on her chest while so testifying. Gentry, also, forced his privates into her mouth, and when she resisted him, he struck her on the head with some kind of a stick. She did not know all that was going on during a part of the time, but remembered that there was water on the bed and that the bed covering was damp. They laid her across the bed, and Taylor held her while Gentry put his mouth on her privates. They left her alone in the little bedroom from two or three o'clock in the morning until two or three o'clock the following afternoon, when they brought her clothes to her and told her they would take her back to town. In the meantime, she tried to get out of the bedroom, but was unable to do so. She did not know whether they remained in the living room all of the time, but she heard music in that room that sounded like a radio. She had nothing to eat while in the house and did not smoke any cigarettes. She tried to get away when Taylor first started to carry her to the car, then concluded she "might as well ride." She rode back to town between Taylor and Gentry and they let her out in front of Robertson's Apartments. She did not talk to them about their treatment of her until she got out of the car. Then, she told them she "was going to have something done about it," and they said "it wouldn't do any good because they had plenty of money." She went to the Tatum home, where her sister (Mrs. Ruth Williams) worked, and reported to her sister what had occurred. "I didn't think anyone would believe my story but my sister." Later that afternoon, she went to the Jackson home. Mrs. Jackson was not at home and did not return until late that night. She told Polly

Waite (colored servant at Jackson's) of her experience, and also told Mrs. Jackson that night and the next morning "about the whole thing," but not until Mrs. Jackson asked her all about it. She remained at Jackson's about ten days, and, a few days later, she had a nervous collapse and was sent to a hospital, where she remained for ten days, under observation for appendicitis. After leaving the hospital, she lived in the home of the sheriff of the county (Guy Humes) until shortly before the trial. She had on a hat, coat, princess slip, "teddys," hose and shoes, when she went to the cabin. When her dress was exhibited at the trial, she referred to a rip in one of the seams and other torn places, which she said were caused by Gentry and Taylor in taking her dress off over her head. She did not know what caused two "burned places" in her dress, and said she had never noticed them before. She had never seen nor heard of Thelma Gishner since that night on the street. She talked to Mrs. John Wise about her age; she didn't think she told Mrs. Wise she was twenty years old, but said: "I am not certain. I wouldn't say I didn't tell her that." She admitted that, in September, 1925, she forged two checks on a bank in Pierce City, her former home; one for $165 in her cousin's name, and the other for $10 in her sister's name; and that she spent the greater part of the money for clothes and a watch and a ring. She said she was not arrested, because her father and brother endorsed her note at the bank and settled the matter, and that she had paid the bank "quite a good deal" on the note out of her wages. She also admitted that, while in St. Louis looking for work on one occasion, she got sick and fainted on the street, and was taken to a hospital, and that, after her folks "telegraphed a ticket" to her, she returned to her home, and was accompanied as far as Monett by Mrs. G. Allender, matron of the Travelers Association in the St. Louis Union Station. She said Mrs. Allender had business in Monett.

Mrs. Ruth Williams said that, when her sister, Bertha Goen, came to the Tatum home, about four o'clock on Thursday afternoon, January 6th, she was nervous and crying, and had bruises on her head and shoulder and "burned spots" on her shoulder. On Friday evening, she telephoned to Mr. Roy Coyne "to find out what could be done in such a case." She knew Mr. Coyne had been prosecuting attorney. He told her "to call Mr. James and report it to him," but did not tell her Mr. James was the assistant prosecuting attorney. The following day (Saturday afternoon) she and her sister went to the office of Dr. James (physician), and, after reporting to him what had happened, he made a physical examination of her sister in her presence.

Dr. R. M. James testified that, when Bertha Goen told him her story on Saturday afternoon, she was nervous and crying, and, upon

examination, he found bruises on her head and shoulder, a burn on her chest, tenderness in her lower abdomen, a discharge from her vagina, and the lips of her vulva badly swollen. On January 19th, he sent her to the hospital because she was displaying symptoms of appendicitis. He said the condition of her vulva and the discharge from her vagina could have been produced by injury, cold, anything that would irritate the walls of the vagina, or by excessive intercourse without force. "One day at the hospital, Frank Weeks told me to give this girl necessary attention and he would see that I got my money. He was out there to visit the girl and handed over $50." This witness further said that Bertha Goen told him she was sixteen years of age.

Dr. H. C. Powers, who was called in consultation on January 19th, gave similar testimony as to Bertha Goen's condition, except as to her privates, of which he made no examination.

Polly Waite said that Bertha was nervous when she returned to Jackson's on Thursday afternoon, and that she "reported this trouble" to her.

Louise Hundley testified that she was working at the Liberty Confectionery in Joplin in October and November, 1926, and that Thelma Gishner came there occasionally during that time; and she told her in January, 1927, she was going to leave Joplin, and she had not seen her since; and that Thelma *Swisher*, pointed out in the court room during the trial, was not the same young lady she referred to as Thelma *Gishner*.

D. H. Southard, deputy sheriff, said he went to the place in question, known as "Taylor's Cabin," about a week after Gentry and Taylor were arrested. The cabin was about five miles north of Joplin, and a block and a half off of the public road, and there was no dwelling house in sight of the cabin. The gate and cabin were both locked. In the living room he found a couch, a chair or two, a dresser, a radio and a victrola, and a ladies dressing-table, on which were some powder, powder puffs and lipstick; and a bed, dresser and oil heater in the little room; also, found a pork chop or two, a part of a cube of butter and some bread in the refrigerator. Everything in the cabin was clean and orderly. The windows in the bedroom were heavily draped, and he was unable to open them, either from the outside or inside. The "fastener" on the door between the living room and the bedroom was a "wooden button about half an inch thick." This button was fastened to the door casing by a screw. He observed automobile tracks between the gate and cabin, which appeared to have been made after the defendants were taken to jail. The State's subpoena for *Thelma Gishner* and the *non est* return thereon, made by this witness, were read in evidence in connection with his testimony. He said he was unable to find her after

a diligent search, and that her name was not in the city directory of Joplin.

Gentry, testifying in his own behalf, said he was twenty-four years old, that he was born in Joplin, and had lived there all of his life. He had been working in Texas for about six months, but returned to Joplin January 1, 1927. He met Taylor at the West Side Pharmacy on Wednesday afternoon, January 5th, and he and Taylor "drove around" in Taylor's car from four o'clock until about six o'clock that afternoon. They met Roy Rice and Carl Rakestraw at the West Side Pharmacy, but had not planned any party at that time. Rakestraw left temporarily and went to the Fourth Street Drug Store, a short distance away. Between six and seven o'clock (after dark), as he came out of the West Side Pharmacy and started toward the car, Bertha Goen "was coming along the street from the east." He did not know her and had never seen her before. "She smiled and spoke," and he tipped his hat, and said: "How do you do?" He invited her to go for a ride and she accepted the invitation, without inquiring who were going, or where. He asked her her name when he got ready to introduce her to Taylor and Rice. "She got right in the car readily and set down" in the front seat. They first drove to the Fourth Street Drug Store and "picked up Rakestraw." Rakestraw said he had "a date" with his girl, and they drove to the south part of Joplin and got two girls, Miss Smith and Miss Deardorff. He did not remember whether Miss Smith and Miss Deardorff were introduced to him or Taylor, and he did not introduce Bertha Goen to them. Taylor was driving, and he was in the front seat, with Bertha on his lap, and Rakestraw and Rice and Miss Smith and Miss Deardorff were in the back seat of the car. They went to another house, where Bertha said she could get a girl for Taylor. He and Bertha went to the door, but were told the girl was not there. They then drove north out of town to "Taylor's Cabin," though nothing had been said about going there. On the way, the conversation in the back seat was about a show, but he was listening to Bertha. She sat on his lap, with her arms around his neck, kissing him, calling him endearing names, and making love to him. He unlocked the gate and the cabin, and Bertha followed him into the cabin. Bertha was by his side when he lighted the lamp in the living room, and also in the bedroom, and, when she saw the bed, she said: "Let's hurry up and get this bed." He thought he closed the door to the bedroom, and he and Bertha started to undress. She undressed first and got into the bed, and he got into the bed with her when he finished undressing. He heard the other members of the party operating the radio and victrola in the living room, but did not know how long they were there. After awhile, Taylor called to him from the living room and said he was going to take the other ladies

home and asked if he (Gentry) and Bertha were going with them. He and Bertha replied that they didn't want to go. He heard nothing more from the other members of the party. He had sexual intercourse with Bertha twice during the night, but "not against her will," and used "absolutely" no force in accomplishing that purpose. He did not strike her at any time, and Taylor did not strike her at any time in his presence. Taylor returned to the cabin the next morning "before daylight," came into the bedroom, took a quilt from the foot of the bed, and laid down on the couch in the living room. He and Bertha got up and dressed later in the morning, and, when he and Taylor and Bertha talked about breakfast, Bertha said: "You have everything to fix it with." He drove Taylor's car to a store and got "a quarter of a pound of butter, pork chops, a small jar of jell, some eggs, and a loaf of bread." Bertha prepared the breakfast, and he and Taylor and Bertha ate breakfast together. Bertha "washed the dishes, cleaned off the table, helped in making up the beds, cleaned up the cabin, and cleaned the car out." She took a walk under the trees and fed crumbs of food to the fishes in the little stream near the cabin, and he took a walk also, while Taylor was "radioing and straightening up the cabin." They left the cabin in the middle of the afternoon, with Bertha riding in the front seat between Taylor and him. When they reached the pavement, Bertha said: "Let's ride around awhile." They turned to the right and drove into town on the Lone Elm Road. They first stopped in front of the Robertson Apartments, and then drove to the West Side Pharmacy, where they sat in a booth awhile and drank "cokes." Bertha said nothing about making any trouble for him and Taylor, but did say something to Taylor "about getting her married sister for Taylor that night and going back to the cabin." He left Bertha and Taylor at the West Side Pharmacy and went to his father's office. He did not try to put his privates in Bertha's mouth, nor try to put his mouth on her privates, and "never thought of such a thing." Bertha smoked cigarettes "quite often" at the cabin that night. He was never convicted of any crime before.

Miss Velma Deardorff, Miss Ella Smith, Carl Rakestraw and Roy Rice testified in Gentry's behalf, and corroborated his testimony in every particular, as to what occurred in the car and at the cabin, during the time they were there.

Miss Deardorff said she was twenty years old, lived at Royal Heights, near Joplin, and was telephone operator at the Interstate Grocery. On the evening of January 5th, Miss Smith "called her up" and made an engagement for her to go to a picture show with her and Mr. Rakestraw and Mr. Rice. All four of them rode in the back seat of the car, and Gentry and Taylor and the other girl in the front seat. They stopped to get a girl for Taylor, but did not get

her. "It looked" to her like the girl in the front seat was sitting on Gentry's lap and had her arm around his neck. "She was patting his cheeks," and "she called him sweet daddy." She protested against this conduct and "wanted to go home," but her escort (Mr. Rice) didn't say anything. Gentry and "this girl" went in the cabin first, and, when they "disappeared in the other room," she thought it was about time to go home, and asked to be taken home. Taylor, then, brought all of them back to town, except Gentry and "the girl." While at the cabin, she did not hear "any cry for help" or "a sound of any kind coming from that room."

Miss Smith gave her age as twenty-one, said she had lived in Joplin all of her life, and was employed by the Joplin Globe. She had "a date" with Mr. Rakestraw to go to a picture show on the evening in question (January 5th), and, at his request, she arranged "a date" for Mr. Rice with Miss Deardorff, the four of them intending to go to the show together. After she got in the car, "some one made the remark to get a girl for Mr. Taylor," and they stopped at a house and some one went in, but came back to the car without the girl. When she asked her escort (Mr. Rakestraw) why they didn't stop "down town, Mr. Taylor said he was going to get a girl and he would return." She "couldn't say" whether the girl in the front seat was in Gentry's lap, but she had "her arm around Gentry" and was talking to him. When she saw "Gentry and this girl had disappeared in the bedroom" at the cabin, "she was ready to come back home." Referring to Miss Deardorff and herself, she said: "We just didn't want to be out there." She did not hear "any noise whatsoever in the other room."

Both Miss Deardorff and Miss Smith said that they had never met Gentry or Taylor or "the girl" before, and were not introduced to them that night. They did not identify Bertha Goen at the trial as the girl who rode in the front seat of the car, because it was dark and they did not get a good look at her. They said, however, that the trip to the cabin was made on the evening of January 5th, and that it was the only time they ever went to the cabin or ever rode in a car with Gentry and Taylor. They said they did not see the men drink any liquor and saw no liquor in the car or at the cabin. They further said that they talked to Mr. Birkhead, the prosecuting attorney, and his assistant, Mr. James, before they talked to Mr. Andrews, Gentry's attorney, and told the attorneys on both sides the same story they had told to the jury.

Carl Rakestraw said he was twenty-four years old, had lived in Joplin six or seven months, and worked at the Fourth Street Drug Store. He knew this affair occurred on the evening of Wednesday, January 5th, because Wednesday was his night off duty, and he had an engagement to take Miss Smith to a picture show. He arranged

with Miss Smith to call Miss Deardorff and make "a date" with her for Rice. "Miss Goen said she knew where she could get a girl" for Taylor, and they went to the girl's house, but she "wasn't at home." Miss Goen was sitting in Gentry's lap. She sat on his lap and kissed him and loved him all the way out to the cabin." When they reached the cabin, "Gentry and this girl got out of the car and went inside. When we got in the room they wasn't in sight. We played one record on the phonograph and these girls thought they was on a kind of a rough party and they said, 'Take us to town,' and out the door they went. Taylor come on out and we took them on to town." He heard no outcry or call for help "from the girl," while at the cabin. After he was "subpoenaed" to testify in this case, Bertha Goen came to the drug store, and in the presence of the cashier (Ruth Williams) said "she was going to make some money out of this and if I kept my mouth shut I wouldn't be forgotten." About two weeks before the trial, she called him on the telephone and talked about the case, and, when he told her he was going to tell the truth, she said: "Please don't." He said Gentry, Taylor and Rice drank some whiskey before Miss Smith and Miss Deardorff got in the car, but not after that; and that he did not take a drink of liquor at any time that afternoon or evening. He admitted that he told Ruth Grant he was on "the party," but said he did not tell her he was going to be a witness in the case and get five hundred dollars out of it. He further admitted that, while a school boy in Pittsburg, Kansas, he was arrested and fined $14.75, because he "raided a party and broke up some cut glass," but he was never "convicted of any other crime."

Roy Rice said he was twenty-one years of age, had lived in Joplin about seven months, and was employed as a clerk at the West Side Pharmacy. He knew Gentry and Taylor and Bertha Goen a short time before the evening they drove to the cabin. Bertha came into the store one night and asked him to call a telephone number for her, and said: "If a woman's voice answers the 'phone, hang up." It was the telephone number of Harry Whitaker, a married man, but no one answered the call. He saw Gentry and Bertha talking "in front of the drug store," and, when he came out of the store, "she was in the car; in the front seat with Gentry and Taylor." Rakestraw arranged "the date" for him with Miss Deardorff. They tried to get a girl for Taylor, but failed, and then drove out to the cabin. "Miss Goen was sitting on Gentry's lap, had her arms around him and calling him loving names. She was calling him her daddy." Gentry and Bertha went in the cabin first. "When we went in the cabin Taylor started up the radio and Gentry and the girl hadn't been in the cabin more than four minutes, and when I went in the room they were in this bedroom. The door was closed

when I went in there and when I went in the room they were in bed. They had their clothes off. They were having sexual intercourse." In a few minutes, Miss Smith and Miss Deardorff said, "if this was the way this thing was going to turn out, they wanted to go home. We proceeded to go home." Taylor "volunteered" to take them back to town. Gentry and Bertha were asked if they wanted to go, and "they said no, they would stay there." This witness admitted that he had "a couple of drinks" that evening, but said he "didn't have enough to be intoxicated or anything like that."

Stephen A. Smith and Lennie Smith, father and mother of Miss Ella Smith, testified that their daughter (Ella) had an engagement with Carl Rakestraw on the evening of January 5th, and that Ella and Mr. Rakestraw were at their home when they (the parents) returned from a picture show between 10:30 and eleven o'clock that night.

Mrs. Lulu Taylor, mother of Wilkins Taylor, said Wilkins came home a few minutes after twelve o'clock on the night of January 5th, "and went to bed," but, at seven o'clock the next morning, "he had gone," and she "didn't know what time he left."

Mrs. Marguerite Jackson, wife of Walter Jackson, a druggist in Joplin, testified that Bertha Goen worked in her home the latter part of December, 1926, and the first part of January, 1927. Bertha was away from her home Wednesday night, January 5th, and had not returned when she (Mrs. Jackson) left home to attend a party Thursday evening. When she returned home "about 12:30" Thursday night she went to Bertha's room and "asked her where she had been and she said she had been locked in a cabin north of Joplin." Bertha continued to work for her about ten days after this happened, but did not at any time tell her "she had been ravished or raped." When she read the newspaper report of this affair, after Gentry and Taylor were arrested, she said: "Bertha, is that you?" Bertha said "that she wasn't sure, but that if it was, her sister had done it; had taken action, and that her sister didn't tell her what she was going to do about it." Bertha made no complaint to her, except that "she had a very bad toothache." On Saturday, "after this Thursday," Bertha called her attention to a wound on her head. "There was a scab about the size of my finger nail, I think as I remember it." On that day Bertha "asked if she could get away and go down to see Doctor James." Bertha did not tell her "she was locked in a cabin with anybody," and she didn't think much about it until she read about it in the newspapers. She denied that she urged Bertha not to prosecute Gentry and Taylor. When Bertha told her that her sister wanted to do something about it, she said: "Well, Bertha, if that is all you are hurt (meaning the injury on her head), why I hate to see you do it because you will just be disgraced."

Mrs. Ruth Williams, wife of Charlie Williams (not the sister of the prosecutrix), said she was cashier at the Fourth Street Drug Store, and that she knew Bertha Goen. She heard a conversation between Carl Rakestraw and Bertha in the drug store, and Bertha said "she would make some money out of this and he would get his if he kept his mouth shut." After that, she answered a telephone ring at the store and a lady asked to talk to Carl Rakestraw. In the conversation that followed, she heard Rakestraw say: "I am going to tell the truth." When Rakestraw "got through" talking, he told her it was "Betty Goen, the girl in the Gentry-Taylor case."

Miss May George and Miss Bertha Elbert, nurses at the hospital, testified that Bertha Goen was under observation for acute appendicitis. They bathed her every day for ten days and noticed no marks or bruises on her body, except a small scratch above the pubic bone. She made no complaint of any injury, but told Miss Elbert that her shoulder had been bruised.

Mr. Roy Coyne, of counsel for Gentry, said that his term as prosecuting attorney of Jasper County expired December 31, 1926. In the first part of January, 1927, a lady who said her name was Ruth Williams, called him on the telephone and said "she thought she had a criminal case." He referred her to J. D. James, assistant prosecuting attorney, and told her his office was in the Joplin National Bank Building; also told her that Mr. Birkhead, the prosecuting attorney, lived in Carthage.

Counsel for the defense offered in evidence the information in the case of State of Missouri v. Overton H. Gentry, Jr., and Wilkins Taylor (No. 7051), in which Gentry and Taylor were jointly charged with the crime of sodomy. That information charges that they (Gentry and Taylor) committed such crime with and against one Bertha Goen "on or about —— day of January, 1927," in Jasper County.

In rebuttal for the State, the prosecutrix said that she was not in the car with Rice and Rakestraw and Miss Smith and Miss Deardorff; that she did not direct them where to get a girl for Taylor; and that she did not smile at Gentry, or speak or nod to him as he came out of the drug store. She said: "I looked at him, but I did not smile and I did not speak." She further said she did not cook breakfast, clean out the car, feed the fishes, take a walk at the cabin, or make any request to stay at the cabin; that she and Gentry and Taylor came back from the cabin "on the Main Street road;" that she did not drink any cokes with them at the West Side Pharmacy; and that she did not tell Gentry and Taylor she would get her sister to go out on "a party" with them. She also denied each and all of the conversations with Rice and Rakestraw, concerning which Rice, Rakestraw and Mrs. Ruth Williams (cashier) testified.

Ruth Grant testified that she was seventeen years old, had lived in Joplin all of her life, and was employed as telephone operator at the Connor Hotel. She had known Carl Rakestraw about two months, and had "kept company with him off and on." He called her one day on the telephone and asked her to come to the drug store, and, when she went, he told her "he would make about five hundred dollars if he would testify he was with them that night," referring to the party at the cabin. Mr. Guy Humes (the sheriff) was the first person she told this story. Mr. Humes asked about it, but she didn't know why or how he happened to mention it.

Dr. M. B. Harutun, commissioner of health of Joplin, and Mrs. L. W. Winter, assistant probation officer and law librarian of Joplin, testified that Gentry's general reputation in the community for morality was bad.

I. Learned counsel argue with much persuasion the improbability of the story of the prosecutrix and the proof in contradiction thereof, on the issue of *consent*, but, unless we are to usurp the function of the jury, their contention as to the insufficiency of the evidence cannot be upheld. Aside from the bruises and cigarette burn, which the prosecutrix says she received in being forced to submit to acts of sodomy, her testimony tends to show that she was taken to the cabin, stripped of her clothing, and ravished by force and against her will. She is corroborated to some extent by the torn places in her dress, her nervousness and the swollen and irritated condition of her private parts for several days thereafter, and the evidence of her prompt complaint concerning her experience to her sister and other persons. It must be conceded that some of her own admissions and the testimony of several disinterested and unimpeached witnesses present a strong challenge to the truth of her story, as to the utmost resistance on her part against the sexual acts in question; yet, it is the peculiar province of the jury to weigh the evidence and pass upon the credibility of the witnesses, and we will not interfere with their verdict, where, as in this case, there is substantial evidence to support it. [State v. Wade, 306 Mo. 457, 268 S. W. 52; State v. Preslar (Mo.), 300 S. W. 687; State v. Pinkard (Mo.), 300 S. W. 748; State v. Thomas (Mo.), 1 S. W. (2d) 157.] It follows that the demurrer to the evidence was properly overruled.

II. No error was committed by the trial court in permitting the State to prove, in rebuttal, that defendant's general reputation for morality was bad. It is well settled that, when a defendant testifies in his own behalf, his credibility, like that of any other witness, may be attacked by proof of that character. [State v. Hodges, 295 S. W. l. c. 787, and cases cited.]

III.   Other complaints as to the admission of improper evidence and the improper cross-examination of the defendant and his witnesses are mentioned in appellant's brief, but are not included, either generally or specifically, in his motion for a new trial.   Such complaints are, therefore, not proper subjects for our consideration on this appeal.   [New Section 4079, Laws 1925, p. 198; State v. Murrell, 289 S. W. 859.]

IV.   Specific errors were assigned, in the motion for a new trial, as to the giving of instructions numbered 4, 5, 7, 8 and 9.   The complaints made against instructions numbered 4, 5 and 9 are well taken and must be sustained.   All of these instructions will be quoted in full, as follows:

"4.   You are instructed that if you believe and find from the evidence that the defendant, Overton H. Gentry, Jr., *in company with one Wilkins Taylor*, at the County of Jasper and State of Missouri, on or about the 5th day of January, 1927, did feloniously and forcibly, and against the will of the prosecuting witness Bertha Goen, make an assault upon her, and feloniously and forcibly, and against her will, did ravish and carnally know her, then you will find the defendant, Overton H. Gentry, Jr., guilty of rape as charged in the information and will assess his punishment at death or imprisonment in the state penitentiary for a term of not less than two years.   And if you do not so find, you will acquit the defendant.

"5.   Before you can find the defendant guilty of rape, you must believe and find from the evidence that the defendant, Overton H. Gentry, Jr., forcibly assaulted and had sexual intercourse with the said Bertha Goen at the time and place mentioned in the preceding instruction, against her will.

"You cannot find that there was such sexual intercourse, unless you believe from the evidence that the defendant penetrated the private parts of the body of the said Bertha Goen with his private parts to some extent.   And you cannot find that such intercourse was forcible or against the will of the said Bertha Goen, or without her consent, unless you find that she made the utmost resistance of which she was capable to prevent it; and whether or not such consent was given should be determined from all the facts and circumstances *which you consider proved by the evidence.*

"7.   The court instructs the jury that the sole charge upon which the defendant is now being tried is rape, which is defined in other instructions, and you must find the defendant guilty or not guilty upon that charge alone; and even though you may believe from the evidence that the defendant was guilty of *any other act of immorality not within the said charge of rape as defined in these instructions,* you cannot return a verdict of guilty in this case because of such acts.

"8. The court instructs the jury that even though you find the defendant guilty of the charge of rape as defined in other instructions in this case, you cannot, for the purpose of fixing or determining the punishment therefor, take into consideration any testimony to the effect that the defendant, *or Wilkins Taylor, or either of them*, caused the male organ of the defendant Gentry, or said Taylor, to be inserted in the mouth of said prosecuting witness or that said defendant placed or applied his mouth to the sexual organ of said prosecuting witness, even though you may believe the same to be true.

"9. The court instructs the jury that the acts testified to upon the part of the plaintiff by the prosecuting witness, Bertha Goen, as to the defendant or Wilkins Taylor, that they or either of them caused the male organ of the defendant or said Taylor to be inserted in the mouth of said prosecuting witness or that said defendant placed or applied his mouth to the sexual organ of the said prosecuting witness, *would, if true, constitute the crime known as sodomy*, and even though you may find such testimony to be true, said acts do not constitute rape."

(Italics in all the foregoing instructions are ours.)

Instruction 4, in effect, told the jury that, in determining the guilt or innocence of the defendant, they could consider the acts of Taylor as the acts of the defendant, if they found that the defendant was "in company with" Taylor at the time of the alleged rape, without requiring the jury to find, in this or any other instruction, that the defendant and Taylor were, at the time in question, acting in concert and in furtherance of a common purpose and design. [Sec. 3687, R. S. 1919.] For the reason mentioned, this instruction was not only erroneous but prejudicial.

In Instruction 5, the court told the jury that the question of whether or not the prosecutrix *consented* to have sexual intercourse with the defendant should be determined from all the facts and circumstances *which they considered proven by the evidence*. Inasmuch as the defendant admitted that he had sexual intercourse with the prosecutrix, the issue of her *consent or lack of consent* to such intercourse was the *vital issue* in the case. In determining this issue from the facts and circumstances which *they considered proven*, the jury may have been so confused or misled as to have believed that they had a roving commission in their consideration of the evidence, and that they were authorized to limit their consideration to certain parts of the evidence and to disregard other parts of the evidence without any consideration whatsoever. At least, the language used in this instruction was susceptible of that interpretation, and, therefore, did not correctly inform the jury as to their duty in the premises. This instruction should have been given in the usual and approved form, by directing the jury that the issue of consent should be de-

termined from a consideration of all of the facts and circumstances *in evidence*. [State v. Dalrymple (Mo.), 270 S. W. 675, 679; State v. Miller, 191 Mo. 587, 596, 90 S. W. 767; State v. Murphy, 118 Mo. 7, 16, 25 S. W. 95.]

Instruction 9, though obviously intended as a cautionary instruction, may have been more harmful than beneficial to the defendant. The court, by this instruction, not only singled out and gave undue prominence to certain facts in evidence, but commented on the legal effect thereof, by declaring that such facts, if true, constituted the crime of sodomy. Thus, the jury was told, in effect, that, if they believed the story of the prosecutrix, the defendant was guilty, not only of the crime of rape, for which he was being tried, but of another crime, a detestable crime, for which he was not on trial. It is apparent at once that such a comment on the evidence was entirely unnecessary, and that an instruction in this form, even though intended as cautionary, was improper and highly prejudicial; and especially so in this instance, because the court had already cautioned the jury, in instructions numbered 7 and 8, against any improper consideration of the facts referred to in Instruction 9, in determining the defendant's guilt or innocence of the crime of rape and in fixing his punishment for such crime, in the event they found him guilty. [State v. Pfeifer, 267 Mo. 23, 28, 183 S. W. 337.]

Instruction 7 may have been confusing to the jury, in referring to *other acts of immorality* without specifying the acts referred to. In other words, the jury may have been confused as to which acts were merely immoral and as to which acts were criminal in character. And Instruction 8 had the same vice as Instruction 4, in referring to the acts of Taylor without advising the jury that such acts on Taylor's part should not be considered unless they found that the defendant and Taylor were acting in concert and for a common purpose. However, we have not condemned these two instructions because they were given for cautionary purposes, and, in our opinion, were not harmful.

V. The motion for a new trial contains only general assignments of error as to refused and omitted instructions. Such assignments present nothing for our review. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856.]

Courts and text-writers on the subject have had much to say concerning the ease with which the charge of forcible rape may be made, prompted by various motives on the part of the woman, and the difficulties of the man who is called upon to defend himself against such an accusation. It will suffice here to repeat that: "Prosecutions upon a charge for which there is a human abhorrence must be conducted with scrupulous fairness so as to avoid adding other prejudice than that which the charge itself frequently produces.

The trained legal mind o.wes this not only to the accused and to society as a whole, but as well to the honest juror, who sometimes, by reason of human sentiment, is led amiss.'' [State v. Davis, 190 S. W. 1. c. 298.] The defendant was deprived of one of his substantial rights by the failure of the trial court to properly instruct the jury on the law of the case, and was, therefore, not accorded a fair and impartial trial.

We find no substantial merit in the other matters complained of, but, because of the errors above indicated, in the giving of improper and prejudicial instructions to the jury, the judgment is reversed, and the cause remanded. *Davis, C.,* concurs; *Higbee, C.,* concurs in the result, but dissents as to Paragraph I.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court; *Walker, J.,* concurs in the result; *Blair, J.,* not sitting; *White, P. J.,* concurs.