THE STATE v. ALBERT McCANN, Appellant.—47 S. W. (2d) 32.

Division Two, February 17, 1932.

750

*Emerson Foulke* and *W. J. Owen* for appellant.

754

*Stratton Shartel,* Attorney-General, and *L. Cunningham,* Special Assistant Attorney- General, and *Ray Watson,* Prosecuting Attorney, for respondent.

WHITE, P. J.—The defendant appeals from a sentence of the Jasper County Circuit Court inflicting upon him the death penalty for murder in the first degree. It was charged that December 14, 1930, Albert McCann, aided and abetted by his wife, Irene McCann, murdered E. O. Bray, acting jailer at Carthage. A severance was ordered, Albert McCann was tried, verdict returned April 20, 1931, and judgment was rendered May 23, 1931.

McCann and his wife, December 14, 1930, drove into Carthage and parked their car. About nine o'clock A. M., Irene McCann went to the jail and asked about one Bill Daggett, who, she supposed, was in jail. She was informed by Bray that Daggett had been released. She went away and returned in about thirty minutes with Albert McCann; they asked to see William Daggett and were again informed that he had been released. Bray turned to look at the record to verify his statement; when his back was turned Albert McCann seized the jailer's pistol, pulled it from the holster and demanded: "Put 'em up." Bray, instead of obeying, attempted to recover his weapon; in the struggle which ensued, McCann discharged the revolver four times, each shot taking effect upon Bray, who died almost instantly. Irene McCann fired one shot which penetrated Albert McCann's leg. They took the keys from Bray and started up stairs. They were unable to find the cell they were looking for. Albert McCann discovered that he was wounded, and the two went down stairs, got in their car and drove away.

The incident was witnessed by John Dyer, son of the jailer, who was present at the time. A trusty and others heard the shots and saw the maneuvers of the defendants as they came in, as they went up the stairs, and as they went away. As Irene McCann went out of the jail door she caught her heel in some way, so that it was pulled off of her shoe. Two weeks later, in Chelsea, Oklahoma, where the McCanns appeared, an officer noticed the absence of a heel on the woman's shoe. He read an account of the killing and the loss of the shoe heel. He arrested the two, and they were taken to Jasper County for trial. While in jail in Carthage in December the appellant signed a written statement. This confession was corroborated by other statements which he made to officers and to others. It

stated that he was nineteen years of age, and that he and his wife left Oklahoma December 13, 1930, arrived at Webb City next day, parked the car and slept in the car at Webb City. That he had been using veranol tablets; had taken a number of them. He had come from Oklahoma for the purpose of getting Ray Jackson, a friend of his, out of the Carthage jail. They went to Carthage on the morning of December 14th; Irene first went to the jail, came back and told the appellant that two men were in the jail office. The confession then described the incidents of grabbing the jailer's gun, the shooting and the escape, very much as related above.

McCann took the jailer's gun with him as he went away. This gun was taken from the defendant at the time he was arrested in Oklahoma.

The defense was insanity. Defendant offered no evidence to contradict that offered by the State to show the killing. He introduced a large volume of evidence to show that his grandparents and his uncles and aunts were insane. Physicians who had examined the defendant testified in answer to hypothetical questions based partly upon their own observations regarding the sanity of the defendant at the time of the homicide. Much of this evidence was excluded and error is assigned to the rulings.

I. The defendant, January 31, 1931, served notice of application for change of venue, and February 2, 1931, he filed his application supported by affidavits of nine persons from more than five different neighborhoods in the county. On the same day the prosecuting attorney filed a motion to strike out the application. The record recites that February 3, 1931, the motion was taken up and by the court sustained "on the grounds that the statute under which said application was filed is a special statute and unconstitutional." There being only one statute relating to the subject, of course it means Section 3630, Revised Statutes 1929.

This ruling is assigned as error. The part of Section 3630 with which we are concerned, is as follows:

"Section 3630. *Petition for change of venue must be proved and may be rebutted.*—The petition of the applicant for a change of venue shall set forth the facts or grounds upon which such change is sought, and such petition shall be supported by the affidavit of petitioner and the affidavit of at least two credible disinterested citizens of the county where said cause is pending and the truth of the allegations thereof shall be proved, to the satisfaction of the court, by legal and competent evidence, and the prosecuting attorney may in such case offer evidence in rebuttal of that submitted in support of such application; the court, or judge in vacation, shall fix the

number of witnesses for which the state or county may be liable; *Provided,* in all cases in counties in this State which now have or may hereafter have a population of less than seventy-five thousand inhabitants if such petition for change of venue is supported by the affidavits of five or more credible disinterested citizens residing in different neighborhoods of the county where said cause is pending, then the court or judge in vacation, shall grant such change of venue, as of course, without additional proof: *Provided further,* that reasonable previous notice of such application shall in all cases be given to the prosecuting attorney . . . ''

Jasper County at the time had a population of less than 75,000. The State claims that that proviso to the section is in contravention of Section 53, Article IV, of the Constitution prohibiting the passage by the General Assembly of any local or special law:

(4) ''Changing the venue in civil or criminal cases;

(17) ''Regulating the practice or jurisdiction or changing the rules of evidence in any judicial proceeding,'' etc.

Other clauses are mentioned in that Section 53 which do not bear directly upon the subject.

Section 3630 divides the counties of the State into two classes for the purpose of changes of venue: those having a population of less than 75,000 in one class, and those having a population of 75,000 and more in another class. The State contends that this is a local or special law, that a general law would be practicable as applied to all counties and therefore no reasonable basis for that classification appears. .

These provisions of Section 53, Article IV, are practically the same, so far as they go, in purpose and effect, as the equal protection provision in the Fourteenth Amendment to the Federal Constitution.

Whether an act be local or special must be determined by the generality with which it affects the people as a whole rather than the extent of the territory over which it operates. If it affects equally all persons that come within its operation it cannot be local or special within the meaning of the Constitution. [State ex rel. Garvey v. Buckner, 308 Mo. 1. c. 401.] That was said in relation to an act concerning the administration of justice in Jackson County abolishing the criminal court and vesting the jurisdiction of criminal cases in the circuit court.

The general rule is that for legislative purposes, other things being equal, counties may be classified according to population. [State ex rel. v. Clark, 275 Mo. 1. c. 107.]

A statute is not void as denying equal protection of the laws if it prescribes different methods of court procedure in different parts of the State; different methods of drawing juries, different number of challenges or different grounds of such challenges. [12 C. J. 1886-7, sec. 954, notes 21 and 26; Herrera v. State, 180 S. W. (Tex.)

1097.] In Davis v. Jasper County, 318 Mo. 248, this court held constitutional an act fixing the prosecuting attorney's salary as applied to counties between 80,000 and 150,000 inhabitants where circuit court is held in two or more places in said county, Jasper County then being the only county to which the conditions applied. The court quoted at length from State ex inf. v. Southern, 265 Mo. 1. c. 286, where it was held that the classification should rest upon a reasonable basis, not upon an arbitrary division; that a classification according to population was sufficient to render a classification a general law.

In State v. Gregori, 318 Mo. 998, this court had under consideration an act providing for the treatment of delinquent children under the age of eighteen years in counties of fifty thousand or more, while in counties of less population a juvenile delinquent is defined as one seventeen years of age or under. The effect was that in a county of less than 50,000 a child between the ages of seventeen and eighteen years would be dealt with as a delinquent child, while in an adjoining county of more than fifty thousand inhabitants the same child on account of the same act would be prosecuted as a criminal. The act denied equal protection of the laws. It was a special law. The difference between that case and this is that the law there held unconstitutional went to the fundamental rights of the party affected. Cases like that are not in point here, because this is a matter of procedure. [State ex rel. v. Roach, 258 Mo. 1. c. 551, and State ex inf. v. Southern, 265 Mo. 1. c. 286.]

In Bridges v. Mining Co., 252 Mo. 53, a statute providing for a filing fee in counties constituting a separate circuit with two judges of the circuit court was held unconstitutional because there was no reasonable basis for the discrimination. That was a matter of procedure.

In this case the statute under consideration does not affect the substantial right of a defendant charged with a crime. The defendant does not complain that his constitutional rights are infringed by the statute. He claims his statutory rights under the proviso. It is the State that says the statute is unconstitutional; it can be held so only if the classification has no reasonable basis. As the law stood before the amendment of 1921 it was the same as Section 3630 now is, except the proviso in relation to counties of less than 75,000 population which was introduced by that amendment. In all counties an application for change of venue had to be supported by affidavit of the petitioner and the affidavits of two creditable and representative citizens, and the allegations had to be proved as required now in counties of 75,000 and over.

The law had been changed from time to time since the Constitution of 1875 was adopted, sometimes including a provision some-

what similar in effect to the amendment of 1921. For a long period prior to that amendment it had been unchanged. Was there reasonable basis for that change and that classification of counties? The purpose of allowing a change of venue is to prevent a trial in a community where the prejudice of the inhabitants is such that the defendant cannot have a fair and impartial trial. The right to a fair trial is the same in all counties. The procedure is to ascertain whether or not such prejudice exists. Manifestly it would be easier of ascertainment in a county of small population than in a county of large population. The Legislature probably concluded that in a county of 75,000 or more such an application tenders an issue of fact which can best be proved by the evidence of witnesses produced in court. Evidently it was thought that in counties of less population an easier and less expensive method would give the court the necessary information. Five affidavits regarding conditions in five different parts of the county ought to furnish a fair basis for an estimate of the sentiment of the county.

In order to prevent imposition and secure a fair estimate of the sentiment the statute provides that previous reasonable notice of the application shall be given the prosecuting attorney, so that he will have an opportunity to challenge the good faith of the application, to examine each affidavit, to learn the character of each affiant and his opportunity to know the situation in the community about which he swears. It is not claimed here that this method would not furnish the court with reliable and sufficient information regarding the alleged prejudice in the county. We think the proviso is constitutional.

In this case the notice was given two days before the application was filed: the application and the affidavits were filed on the same day on which the motion was filed to strike out the application. The court did not rule upon whether the notice was sufficient. Manifestly, however, it was not sufficient to enable the prosecuting attorney to investigate the affiants. The application could have been properly overruled for that reason, but it was stricken out on the motion. The case was continued and the same application with the same affidavits were refiled at a subsequent term, the prosecuting attorney waiving notice. He had plenty of time during the more than a month which intervened to ascertain the character of the affiants and their opportunity to know what they swore about.

When the application was refiled it was overruled. The State makes the point that we cannot consider the application as at first filed because there was no term bill of exceptions, though all matters in relation to it appear in the general bill of exceptions filed after the term. Under Section 1460, Revised Statutes 1929, and under Section 1009, Revised Statutes 1929, a bill of exceptions may be filed at any time within which the

appellant's abstract of the record may be served. [Smith v. Fire Ins. Co., 320 Mo. l. c. 163; Kansas City v. Jones Store Co., 325 Mo. 226, 28 S. W. (2d) 1013; State v. Bennett, 6 S. W. (2d) 881.] A term bill was not necessary.

It is claimed further by the State that even if the record of that proceeding is properly preserved, determination of that matter is *res adjudicata* and cannot be inquired into again on the refiling of the application. The Attorney-General does not explain how he can claim *res adjudicata* in a ruling when he says it is not preserved for consideration. There is a distinction between orders upon motions respecting collateral questions arising in the course of the trial, and final orders affecting the substantial rights, or orders from which appeal lies. The doctrine of *res adjudicata* does not apply with the same strictness to an order made on a motion involving merely a question of practice as to a judgment upon the merits. [20 R. C. L. 514, 515; 34 C. J. 763.] Where a motion is merely incidental or collateral to the main issue it will not preclude parties from renewing the same contentions in another form. [Ann. Cases, 1914-D, 974.] In this case the court did not pass upon the merits of the first application, and made no inquiry whether the affidavits in support of the motion for the application were in conformity to the statute or were sufficient in any respect, but held unconstitutional the statute under which the application was made. There can be no *res adjudicata* unless there has been a judgment or order affecting the issue tendered. So the ruling of the court in striking out the application in the first instance was not a determination of the question whether the affidavits were sufficient, and the defendant had a right to make the same application on the same ground at a subsequent term of the court. It is not claimed that a refiling of the same application is anything different from presenting another application on exactly the same ground as the first.

It is claimed further that the affidavits are not in form because mere conclusion and do not state facts sufficient to bring them within the requirements of the statute; that they did not show the knowledge of the alleged prejudice on the part of the affiants. One of the affidavits by G. H. Medlin states that he lives at Dequesne in Jasper County; that he knows great feeling and sentiment exist against Albert McCann in the neighborhood where he lives; that he has heard many people discuss the murder of jailer Bray; that on divers occasions he had heard people say that the parties who committed the murder should be hanged and that no jury in the county could be gotten who would not hang them regardless of testimony and that this crime had been attributed to McCann and his wife—what was termed "his gang." That some of

these persons called attention to the fact that the murderer was said to be insane, but notwithstanding, the almost unanimous opinion of the people who discussed the case was that those parties should be hanged. There were nine of those affidavits coming from more than five different neighborhoods in Jasper County; all of them mentioned specific facts very similar to those mentioned in the affidavit of Medlin.

In State v. Wilcox, 44 S. W. (2d) 85, decided at this term of court, we held sufficient under that statute to warrant a change of venue affidavits less specific than these in the detail of facts. Therefore we hold that the application as first presented at the January term was insufficient, the court could have properly overruled the application for want of sufficient notice. The court, however, was in error in striking out the application without considering it on its merits or the sufficiency of the notice. Then when the application was renewed at the April term it was in all respects in the form required by statute and should have been granted.

II. When the defendant offered evidence of lay witnesses to prove his insanity the court required such witnesses first to state the facts upon which they based their opinions, but made no such requirement of the witnesses for the State who testified that the defendant was sane. This is complained of as error.

The rule requiring a lay witness to state the facts upon which he bases his opinion does not apply to a witness who testifies to the sanity of the person under consideration, because a sane mind is not distinguished by eccentricities which mark the conduct of an insane person. If a person acts and speaks as a normal person no specific facts need be mentioned. [State v. Liolios, 285 Mo. l. c. 13, 14; State v. Cockriel, 314 Mo. l. c. 713; State v. Finley, 321 Mo. l. c. 623; State v. Soper, 148 Mo. l. c. 235.]

III. Appellant complains of error in exclusion of testimony of his expert witness. He introduced Dr. Romeiser, and propounded to him a hypothetical question to which the State's attorney objected because it included facts not in evidence. The court ruled that the question was incompetent. Defendant's counsel reframed his question and asked it again, with the same objection and the same ruling. The third time he framed his question with the same result. He framed his fourth question, and the court allowed the witness to answer it. It was further shown that the physician had made a personal examination of the defendant. He was asked whether assuming the facts stated in the hypothetical question were true and whether taken with his own examination the defend-

ant was sane or insane. The witness said that he could not answer the question categorically "yes" or "no" for the reason that mental defectives were not classed as insane. This answer on the State's objection was ruled out. The witness said that he could not answer the question without qualification and added that the defendant had not a normal mind. That statement was ruled out before he could finish it. The witness finally said that he had examined the defendant and had formed an opinion based upon his medical knowledge and experience in his practice, and that he would like to express that opinion. The court sustained the State's objection and he was not permitted to answer.

We have been cited to no authority holding that an explanation of the mental condition of a party who is under consideration should not be given by an expert. The ultimate fact to be determined by the jury is whether the defendant's mind was so affected that he had no knowledge of right or wrong. An expert is never permitted to answer that question. [State v. Schlichter, 263 Mo. l. c. 577; State v. Brown, 181 Mo. l. c. 215.]

There are many forms of insanity; a condition which one expert would pronounce insanity another expert would not. A person may be insane on some subjects and perfectly rational in regard to others. One may be a normal person in his actions and in his mental processes generally, yet under stress of peculiar kinds of excitement may become entirely irrational without consciousness of the consequences of his acts. By the influence of drugs one who is usually normal may be rendered incapable of rational conduct for a time. What would characterize a man as of unsound mind, incapable of making a will or a contract, might not at all excuse him for the commission of a crime. The defendant in his confession stated that he had taken several tablets of veranol just before the homicide occurred. There was a quantity of evidence tending to show an abnormal condition of his mind and his eccentric actions. It was for the jury to say, under all the circumstances adduced, whether at the time the homicide was committed he was conscious of the nature of his acts. Anything that an expert physician observed in his conduct and in his mental processes would tend to throw light on the ultimate question whether he was capable of the deliberate action of murder in the first degree. It is competent for an expert to testify whether certain symptoms or certain acts are consistent with sanity or indicate insanity; whether a trait under consideration indicates a vice or a disease; he may state how the mind of a person has been affected by disease; by inherited predispositions; whether a person is malingering. [1 Wharton & Stille, Medical Jurisprudence, 410-411; 22 C. J. 721, 669; Underhill's Crim. Evidence (3 Ed.) sec. 267; 16 C. J. 111.]

The question allowed was limited to whether in the opinion of the expert the subject was sane or insane. But we see no reason why an answer to the question must be limited to yes or no. If that were the ultimate fact to be proven it would be incompetent, because it was for the jury to determine. Being the expression of opinion which would throw light upon the ultimate fact it is like any other fact bearing upon that question. Dr. Romeiser was not asked to give a definition of insanity, nor was the meaning of the terms sane and insane embodied in any question asked him as related to the facts in this case. His answer, if he had been allowed to state the opinion he had formed from an examination of this defendant and from the facts propounded to him in the hypothetical question, prob- ably would have tended to throw light upon the ultimate question at issue. It was error to exclude it.

Dr. Tyler was offered by defendant as a witness. He examined Albert McCann. He had attended members of the McCann family and had known the defendant since his birth. He had observed him up until two years before the trial and he would say he was crazy. This was stricken out. On objection of the State the court ruled that the Doctor must answer whether or not the defendant was sane or insane. The ruling was erroneous for the reasons stated in regard to the testimony of Dr. Romeiser. The witness was examined at some length, and later in his testimony the witness was permitted to say that the defendant was crazy and that he was insane.

IV. Appellant complains further that error was committed in admitting his confession made to the sheriff. He was examined in the absence of the jury and the court took other evidence as to wheth- er his confession was voluntary or involuntary and the court held it to be admissible. The evidence was ample to justify that conclusion. When the confession was introduced in evidence the defendant did not then offer evidence before the jury tending to show that it was not voluntary. We find there was no error in that regard.

V. Error is also assigned to the ruling of the court in permitting the widow of the deceased to remain in the court-room during the trial after she had testified. The court ruled that she would be excluded like other witnesses, but after she testified she might remain.

The cases upon that point hold that it is error to permit a person in such situation to remain in the courtroom if he or she makes demonstration of grief tending to excite the sympathy of the jury. The point made by appellant was that the widow was permitted to cry at intervals and display her feelings to the jury. The record

shows nothing of the kind and we find there was no error in that regard. The statement in the motion that the widow showed her feelings does not prove itself.

A heel from the shoe of Irene McCann was found at the jail gate after the homicide. Later, when she was arrested, it was found that one of her shoes was without a heel and the heel found fitted that shoe. Error is assigned to the admission of this evidence on the ground that it was incompetent as against the defendant. The appellant and his wife came together. They were acting together and it was a mere circumstance tending to show her presence at the time the homicide was committed; one of the circumstances surrounding the case. There was no error in admitting it.

Error is assigned also to the exclusion by the court of evidence to show that when the defendant's mother was pregnant with him before his birth she nursed an aunt who at the time was insane. The insanity of this aunt was shown. The defendant offered no evidence to show that close association by a pregnant woman with an insane person would have any effect upon the child afterwards born. Therefore there was no foundation laid for the introduction of such evidence.

VI. Complaint is made of the refusal of appellant's Instruction C, which told the jury that if the defendant's mental faculties were deranged so as to render him incapable of knowing the right from the wrong in the act of killing, it was immaterial what caused such deranged or perverted condition, whether it was brought about by drugs or the excessive use of alcohol or hereditary disease, etc. While the defendant's confession said that he had taken several tablets of veranol the morning of the homicide, no evidence was offered to show that at the time he was under the influence of drugs or that his mind had been so impaired by the previous use of drugs and alcohol as to destroy his judgment and render him incapable of knowing right from wrong. The instruction was properly refused for that reason.

Also of Instruction A offered by defendant, which told the jury that if the defendant was suffering from a perverted and deranged mental condition such as to render him incapable of distinguishing between right and wrong, or unconscious at the time, or, *though conscious of them and able to distinguish between right and wrong and to know the acts done were wrong*, "yet if you find and believe that his will, the governing power of his mind, was otherwise than voluntarily so completely destroyed that his action was not subject to it but beyond his con-

trol'' they should acquit the defendant on the ground of insanity. Under that instruction the jury would be permitted to acquit the defendant on the ground of insanity if he was guilty of manslaughter, or some offense less than murder in the first degree. There is no evidence that the defendant was under an uncontrollable impulse so that the governing power of his mind was destroyed. The instruction was properly refused.

Appellant further claims error was committed because in Instructions 4 and 5, the court did not properly define ''material fact.'' The court defined it in Instruction 4 as ''any fact which tends to prove or disprove the guilt or innocence of the defendant.'' No reason is advanced as to why that definition is not sufficient.

Error is assigned to the giving of Instruction 8, which was in the usual form, to the effect that where one intentionally uses a deadly weapon upon a vital part in the absence of qualifying facts he is presumed to know the effect is likely to produce death and is presumed to intend to produce death. If such weapon is used without just cause or provocation he is presumed to have done it wickedly, and the objectionable part closes the instruction as follows:

''And the court instructs you that there is no evidence in this case of just cause or provocation.''

Appellant complains that that takes away his defense of insanity. No reason or authority is advanced to show why insanity in such a case would be a just cause or provocation. Section 3985, Revised Statutes 1929, defines ''justifiable homicide.'' It does not include insanity, nor anything like it. It is homicide where there is justification for the act. Excusable homicide is defined in Section 3986 which is quite specific, but it does not include insanity. Yet homicide committed while the killer is insane, incapable of discerning between the right and wrong of the act, while it is in no sense justifiable it may be excusable though not excused by the statute. The law has been always so declared.

The definition of ''deliberately'' in Instruction 9, is erroneous and should not be repeated on another trial, although it was harmless in this instance. [State v. Hershon, 329 Mo. 469.]

Complaint in the motion is made of Instruction 12 given for the State, because it requires that there should be ''substantial'' evidence of insanity to justify an acquittal, because the word ''substantial'' as used would be misleading and would tend to have the jury exclude competent evidence. No definition of the word ''substantial'' is offered by the defendant. The jury could understand what it means be-

cause the court so fully and completely instructed the jury upon the subject of insanity. The complaint which the appellant makes in his brief is because of the introductory sentence "Insanity is interposed *by the counsel for defendant* as an excuse for the charge set forth in the information." State v. Liolios is cited by appellant, 225 S. W. 841, 285 Mo. 1. The objection in that case was the use of the words "by defendant's counsel." That expression was held "unfortunate" where temporary insanity at the time of the commission of the crime was interposed as a defense. The case was not reversed on that ground. On another trial such instruction, if given, should leave out that expression "by defendant's counsel."

VII. Numerous other errors are assigned by appellant relating to the selection of the jury, the argument of counsel for the State,—incidents which probably would not occur in another trial. Numerous objections and exceptions were saved during the progress of the trial to the admission of evidence and to the conduct of the prosecution. The most of this we do not deem of sufficient importance to deserve specific consideration. Some of them are not preserved in the motion for new trial, and others are not likely to occur on another trial.

For the reasons mentioned the judgment is reversed and the cause remanded. All concur.