THE STATE v. CHESTER JACKSON, Appellant.—142 S. W. (2d) 45.

Division Two, July 3, 1940.

*Ralph Baird* and *Russell Mallett* for appellant.

476

*Roy McKittrick,* Attorney General, and *Tyre W. Burton,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant, a negro thirty-one years old, was

convicted by a jury of murder in the first degree in the circuit court of Jasper County and his punishment fixed at death, for shooting and killing his paramour Daisy Esmond on August 3, 1938. He was tried once before on the same charge with the same result, but that conviction was reversed by this court in 344 Mo. 1055, 130 S. W. (2d) 595, because his application for a continuance had been overruled and the trial court failed to instruct on murder in the second degree. He is still faithfully represented by the same counsel who were appointed by the trial court at the beginning of the litigation. The commission of the homicide is not denied. The appellant did not testify. The defense was insanity or irresistible impulse. The errors assigned on this second appeal complain of the exclusion of testimony and the refusal of four instructions, all on that issue.

The appellant went to the house where the deceased was staying, jerked open a hooked screen door, shot her in the back in her bedroom, and also pointed his pistol at her sister and brother-in-law, both of whom were present. His face showed he was angry and he didn't take his eyes off the witness (the sister) after he pointed the pistol at her until he got ready to leave.

The testimony of three witnesses for whom appellant had worked at odd jobs over a period of years indicates he was a man of a rather low grade of intelligence but not out of the ordinary as such negro roustabouts go. He was given to cutting capers and playing around. For this reason one witness described him as being more or less childish, and another expressed the opinion that he didn't act like a man of his age but more like a big boy. However, he could do manual labor, such as janitor work, washing and greasing automobiles, and dock work, but he couldn't check freight and couldn't properly load freight. This was all the evidence introduced for appellant. His main assignment of error complains of the trial court's refusal to permit Dr. A. M. Gregg to testify as an expert witness in his behalf.

Dr. Gregg was a duly licensed physician who had engaged in the general practice of medicine at Joplin for 25 years, but was not a specialist in mental diseases. He testified he had treated appellant over a period of about five months for a bone disease in one leg when the latter was a boy ten to fourteen years old, which was 17 to 21 years before the trial; but had never examined him since, and had not seen him for two years, the last time being less than a year before the homicide. During the intervening 15 or 20 years he had seen the appellant off and on, knew him quite well, and had passed the time of day with him frequently. Thereupon appellant's counsel endeavored to elicit further testimony from the doctor as follows, proper exceptions being saved to all adverse rulings:

"Q. You have seen him since the time you treated him when he was a boy and you have passed the time of day with him, and you have observed his conditions, and your acquaintance because of that as-

sociation with him and that treatment of him, and you are familiar with his mental condition are you not? A. Yes, sir.

"Q. Now, will you tell the jury what in your opinion his mental condition is? (Objection sustained.)

"Q. Are you from the association which I have named with him, and the treatment you have given him, are you, as a physician and surgeon, of the opinion that you knew also his mental condition on August 3rd, 1938?" (Objection sustained.)

The objections to the foregoing questions made by the prosecuting attorney (quoted substantially) were that "the question is too remote, the doctor having testified that he has not examined the appellant for seventeen years, and had never examined him to testify as to his condition of August 3rd, 1938." The objections being sustained, appellant's counsel made this offer of proof, which was rejected by the court:

"We offer to show by this testimony that even though the doctor hasn't treated the defendant, Chester Jackson, for seventeen years, we offer this testimony to show that as a result of the severe pain and fever attending his condition at that time that his mental condition was so arrested as to annihilate his mental and moral faculties."

Then appellant's counsel *asked the court to give him five minutes* "in which the doctor can examine the defendant, and again take the stand and have his testimony offered before the Court." Then the following occurred: "By the COURT: The request will be refused. I want the record to show that the Court recessed at 11:15 this morning until 2:00 o'clock for the purpose of permitting the doctor to be present and testify. The Court feels that the Court cannot be further delayed when the examination could have been had, the defendant has been in the County Jail here some time, and he could have been examined at any time prior to the trial of this case. The Court further feels that five minutes would probably not be sufficient to make an examination or determine the mental condition of the defendant.

"By Mr. MALLETT: Then we request for what the Court deems sufficient time.

"By the COURT: The request will be refused.

"By Mr. MALLETT: We also object to the ruling of the Court for the reason that the witness, Dr. Gregg, is a voluntary witness, he had not been paid anything for his services; that the defendant, Chester Jackson, is being defended by attorneys appointed for him by the Court because he has no money with which to employ counsel, and that we have never at any time had any money to secure an examination of the defendant by a doctor of his own choice, and thereby request the Court to permit us to have this opportunity—to, as the first opportunity since the defendant, Chester Jackson, has been back in the County Jail on this charge. We further wish to object to the ruling of the Court for the reason that Dr. Gregg, this morning, when

the time was extended from approximately 11:30 to 2:00 o'clock was busy in the hospital with an operation, and could not possibly come to Court until 2:00 o'clock, and that the Court had recessed until that time and immediately upon Dr. Gregg's appearance Court was convened and the doctor called to take the stand, and that during the recess we had no opportunity of permitting Dr. Gregg to examine the defendant, Chester Jackson.

"By the COURT: Gentlemen, I understand further, from the opening statement of counsel for the defendant that it is not the intention of the defendant, or the attorneys for the defendant, that the defendant is insane,—this testimony is not for the purpose of showing insanity.

"By Mr. MALLETT: This testimony is given for the purpose of showing that the defendant, Chester Jackson, is not a normally minded person; that he is mentally deficient, and that he has the mind of a child, and that he does not have the will-power—the willpower to overcome his passions, or his desires, and that it would be a question for the jury as to whether or not, under those circumstances, he is sane, or insane, and we request that the doctor be permitted to answer the questions, or to examine the defendant and then give his answer.

"By the COURT: *The request will be refused.*

"Q. (By Mr. MALLETT) During the time you treated the defendant will you tell the jury whether he was subject to high fevers. (Objected sustained.)

"Q. Was the defendant during those treatments extending over four or five months in extreme or excruciating pain?

"By Mr. COYNE: Objected to, that doesn't prove or disprove any issue in the case.

"By the COURT: Objection sustained. Mr. Mallett, the Court is of the opinion that any testimony given by the doctor as to what took place at the time of his examination would be incompetent.

"By Mr. MALLETT: We offer the testimony of Dr. Gregg for the purpose of showing that the defendant's mental condition, because of the excruciating pain and high fevers which racked his body, and his brain so scarred and injured the defendant in his whole body, and that his mind, the growth of it, was arrested so that he never at any time became a normal child, and that the doctor's association with him and acquaintance with him up to a few months before the act charged in the indictment was committed, is able to say and would say, if permitted to testify that his mind had not grown since the time when the doctor treated him, and is still undeveloped, and that he is a degenerate, and that he does not have a mind of more than a ten-year old boy, and that his will-power is so weak that should he become aroused, he would be irresponsible for his conduct, and that he does

not have the will-power, that is the governing power of his mind, is so weak and so destroyed, that he does not have the power to curb his desires, his impulses, or his instincts, when once they are aroused. We offer that testimony on the part of Dr. Mitchell Gregg.'' (Offer refused.)

Presently appellant's counsel asked the witness this question: ''Q. From your acquaintance with this defendant, doctor, and your treatment of him as you have detailed, and your acquaintance with him up to a few months before the act charged was committed, are you able to say whether or not the defendant has sufficient will-power and mentality to overcome violent passions or intent?'' An objection was sustained on ground that inquiry was directed to a period too remote, and appellant's counsel declared the witness would testify that the fact was as stated in the question.

It will be remembered the only objection interposed by the prosecuting attorney and sustained by the court to the admission of the proffered testimony of Dr. Gregg was that he had not examined appellant for seventeen years, and never had done so with a view to determining his criminal responsibility on August 3, 1938, the date of the homicide. If the case stood alone on the soundness of that ruling, we should, under our decisions, be in some doubt about its correctness. The witness was a physician who had practiced medicine in Joplin for 25 years. He had treated appellant for five months some 17 years or more before the homicide and frequently been in touch with him nonprofessionally thereafter until less than a year before the killing. He swore that from these contacts he knew appellant's mental condition.

Even lay witnesses may express an opinion on the insanity of a human being, based on facts ascertained from personal contact, conversation and the like, although such observations were not made for the purpose of forming an opinion as to the sanity or insanity of the person at any given time, or at all. And the view has been adhered to in this State that ''great latitude is allowed in an investigation of the subject of insanity where it is interposed as a defense in a criminal prosecution. Evidence of anything and everything which in some substantial way would tend to show that defendant's nervous organization was affected should be admitted.'' Further, it is said the law fixes no particular limitation as to the period of time which the inquiry may cover. [State v. Murphy, 338 Mo. 291, 306(4), 90 S. W. (2d) 103, 111(6); State v. Warren, 317 Mo. 843, 855, 297 S. W. 397, 402(6); State v. Tarwater, 293 Mo. 273, 293, 239 S. W. 480, 486(16, 17); State v. Morris, 263 Mo. 339, 348, 172 S. W. 603, 605(2); State v. Porter, 213 Mo. 43, 60, 64, 111 S. W. 529, 532(4), 534(8), 127 Am. St. Rep. 589; State v. Speyer, 194 Mo. 459, 468, 91 S. W. 1075, 1078.]

However, this liberal doctrine is not unbounded. Always the issue turns on the mental condition of the accused at the time of the com-

mission of the offense charged. Within a reasonable range, the weight but not the admissibility of the witnesses' opinions on that issue depends upon their opportunities for observation—whether their acquaintance with the accused was more or less recent and intimate, their contacts more or less frequent and their observations more or less purposeful and discerning. But if these were so remote, infrequent or casual that an intelligent opinion could not be based thereon, their testimony is valueless and should be excluded. [2 Wigmore on Evidence (3 Ed.), sec 650, p. 755, 3 ibid., sec 689, p. 9; 7 ibid., sec. 1934, p. 33; 22 C. J., sec. 699, p. 606, sec. 766, p. 678; 16 C. J. sec. 1540, p. 1751, sec. 1541, p. 752; State v. Soper, 148 Mo. 217, 234(4), 49 S. W. 1007, 1010; State v. Palmer, 161 Mo. 152, 175, 61 S. W. 651, 658; Nute v. Fry, 341 Mo. 1138, 1145, 111 S. W. (2d) 84, 87.]

It is generally conceded that no helpful rule can be formulated declaring what minimum knowledge will qualify a witness to express an opinion on the insanity of a person; and that the determination of that question in each case must be confided largely to the discretion of the trial court, with which appellate courts do not interfere unless the ruling was clearly erroneous. [20 Am. Jur., sec. 773, p. 645, sec. 786, p. 660; 22 C. J., sec. 701, p. 609, sec. 610, p. 526.] In 3 Wigmore on Evidence (3 Ed.), sec. 689, p. 9, the learned author declares: "The truth is that the test should be left in the hands of the trial judge. Neither its exact phrasing, nor its application in a given instance, should be made to occupy the time of the highest Courts." So, not to save time but in deference to the trial court's better understanding of the facts, and for another reason next to be stated, we overrule this assignment.

The other reason just mentioned has to do with the character of Dr. Gregg's proffered testimony. Where it is not contended that the accused is an idiot, lunatic or insane person, evidence of feeble intellect and weak intelligence is not admissible. [16 C. J., sec. 1081, p. 557; 20 Am. Jur., sec. 349, p. 324.] In Missouri and a majority of the other states the mental test for criminal responsibility is whether the accused was capable of distinguishing right from wrong as applied to the particular act. Mere irresistible impulse is not an excuse. In other words, we do not recognize the defense of "volitional insanity" (meaning that although the accused can distinguish between right and wrong, still he is unable because of mental disease to resist the impulse to commit the criminal act). But that, in our opinion, was all appellants offer of proof tended to show. The authorities on the legal proposition are numerous. [27 L. R. A. (N. S.) 461, note; 70 A. L. R. pp. 659, 675, annotation; 16 C. J., secs. 72-77, pp. 98-102; 14 Am. Jur., secs. 32-36, pp. 788-793; State v. Pagels, 92 Mo. 300, 317, 4 S. W. 931, 937; State v. Miller, 111 Mo. 542, 551, 20 S. W. 243; 244; State v. Berry, 179 Mo. 377, 381, 78 S. W. 611, 613; State v. Riddle, 245 Mo. 451, 457, 150 S. W. 1044, 1045, 43 L. R. A. (N. S.)

150, Ann. Cas. 1914A, 886; State v. Weagley, 286 Mo. 677, 690, 228 S. W. 817, 820.] The apparently contrary ruling in State v. Miller (Mo. Div. 2), 225 S. W. 913, 915, was obiter and ill considered.

To verify the conclusion stated above a glance back through the record may be advisable. Appellant first offered to prove that as a result of the severe pain and fever attending his illness seventeen years before "his mental condition was so arrested as to annihilate his mental and moral faculties." Later when the court announced its understanding from appellant's opening statement that the testimony of Dr. Gregg was not offered to prove insanity, his counsel replied: "This testimony is given for the purpose of showing that the defendant, Chester Jackson, is not a normally minded person; that he is mentally deficient, and that he has the mind of a child, and that he does not have the will-power to overcome his passions, or his desires." Still later counsel further stated that the pain and fever from appellant's illness seventeen years before so scarred and injured him that the growth of his mind was arrested and he never became a normal child. Continuing, he said the doctor would testify that appellant's mind had not grown since his illness and is still undeveloped; that he is a degenerate, and does not have the mind of more than a ten year old boy. Following that, the statement was repeated that appellant's will power was so weak that he was unable to control his desires, impulses and instincts when aroused.

■ None of that proves insanity in the sense required by our law. As already stated, the defense of irresistible impulse is not recognized in Missouri. And in practically all jurisdictions mere retarded mental development or subnormality is not a defense. The prevailing rule on this question is thus set out in 14 Am. Jur., supra, sec. 32, p. 788: "Criminal responsibility does not depend on the mental age of the accused or upon the question whether his mind is above or below that of the ideal, average, or normal. Mere weakness of mind, ignorance, or deficiency in any mental function is not in law equivalent to a want of capacity and will not excuse the perpetration of a criminal act, unless the mentality of such a person is of such subnormal character as to render him incapable of distinguishing between right and wrong, in which case it is undoubtedly a defense. The law does not require, as the condition on which criminal responsibility shall follow the commission of crime, the possession of one's faculties in full vigor or a mind unimpaired by disease or infirmity." [See also 10 L. R. A. (N. S.) 999, note; 44 A. L. R. 584, annotation.]

■ As regards the retarded mental development of appellant, his counsel contended mental growth was arrested by the pain and fever suffered when he had the bone disease in his youth. At one place counsel stated this was when he was ten to fourteen years old. Thereafter the illness was referred to by both sides as having occurred seventeen years earlier—which would have been when appellant was

fourteen. But one offer of proof was that Dr. Gregg would testify the appellant did not have the mind of more than a ten year old boy. Whichever age his mind may have been makes no difference. While there is a common law presumption in this State that an infant between the age of seven and fourteen has no criminal capacity (State v. Adams, 76 Mo. 355, 357), there is no such presumption in favor of an adult of that alleged mental age. See the following cases where the defendant's mental level was estimated at twelve years: State v. Marquis, .344 Ill. 261, 267, 176 N. E. 314, 316, 74 A. L. R. 751, 756; Commonwealth v. Stewart, 255 Mass. 9, 13, 151 N. E. 74, 44 A. L. R.' 579, 580; Conway v. State, 118 Ind. 482, 490, 21 N. E. 285, 287.

It may be suggested that no objection to the testimony was made by the State on the ground here discussed—that it failed to make a prima facie showing of insanity. That is true, except insofar as the trial court raised the point by informing appellant's counsel of its understanding that they were not relying on the defense of insanity. But even so, since the testimony tendered no legal defense, the court did not err in excluding it. Indeed, even where testimony of no probative value has been *admitted* without objection, it is the duty not only of trial courts but of appellate courts to declare its legal effect. [Nodaway County v. Williams (Mo. Div. 1), 199 S. W. 224, 227(5); Kane v. Mo. Pac. Ry. Co., 251 Mo. 13, 44, 157 S. W. 644, 653(9).]

Another thing to be considered is that the legal theory on which appellant's counsel offered the testimony of Dr. Gregg did not make it admissible as proof of insanity. When the court announced its understanding that they did not rely on the defense of insanity they guardedly answered the proof was tendered to show appellant was not normally minded, was mentally deficient and childlike, and had no will power. "Under those circumstances," they said, it would be a question for the jury whether he was sane or insane. As we have already seen, that is not the law in this State; and the court therefore did not err in excluding the testimony (even though it might have been competent on some other ground). [16.C. J., sec. 2152, p. 852.]

It may be replied that appellant's counsel were not required to announce the testimony would show the appellant could not distinguish right from wrong, because the witness would not have been permitted to state that ultimate fact—and there is authority in this State to that effect, State v. McCann, 329 Mo. 748, 763, 47 S. W. (2d) 95, 99(10), although the contrary is vigorously and logically maintained in 7 Wigmore on Evidence (3 Ed.), secs. 1920, 1921, pp. 17, 18. But even if the former view be correct it has no application here; for counsel were stating their theory of the *legal* effect of the proffered testimony, and in doing so the rule just referred to would not excuse them from offering it on a ground that would make it admissible. We do not

mean they were guilty of oversight; on the contrary we think they presented their views as strongly as they could. Appellant's first assignment is disallowed for the several reasons stated.

■ Supplementing the foregoing assignment is another that the trial court prejudicially abused its discretion in refusing to order a five minute recess or a reasonable recess to permit Dr. Gregg to examine appellant and then .testify as to his mental condition at the time of the homicide. As a basis for this contention appellant sets out again in his motion for new trial that part of the above proceedings beginning and ending with the lines we have italicized. We refer the reader back to it. It will be seen the request followed the court's ruling that Dr. Gregg's examination of the appellant for a physical ailment seventeen years before was too remote to serve as a foundation for an expert opinion as to his mental condition on August 3, 1938. The law is well settled that the matter of granting short recesses or adjournments during the trial of a case rests largely in the discretion of the trial court. [16 C. J., sec. 2088, p. 825; 64 C. J., sec. 86, p. 84; State v. Morefield, 342 Mo. 1059, 1066, 119 S. W. (2d) 315, 318.]

This assignment has given us some concern. The question is, of course, whether the trial court abused its discretion. The testimony sought to be introduced was not cumulative, as in the Morefield case, supra. Dr. Gregg was the only expert witness appellant had. Five minutes does not seem an unreasonably long time to interrupt a trial where the issue is life or death. A court would ordinarily grant that much time to allow an attorney to answer or make a telephone call, find a paper or get a book. On the other hand it seems incredible that counsel for appellant would start into the two day trial of a first degree murder case relying on insanity as a defense, without arrangements for some qualified expert witness on that issue, if they intended to produce such testimony. Especially is this true when it is remembered the case had been tried once before, come to this court, and had been remanded for another trial, the same counsel officiating throughout.

The record shows the course of the trial was as follows. It started on September 28, 1939, and four witnesses for the State were examined. The second day court convened at 9 A. M. and the State examined four more witnesses and rested. The defense examined two witnesses. Then a deputy sheriff announced he had telephoned Dr. Gregg at the hospital, and was informed the doctor could not report as a witness until 2 P. M. on account of an operation he had to perform. Accordingly court recessed over the noon hour until 1:30 P. M. The time when this recess was taken, as stated in the record by the court was 11:15 A. M.; appellant's counsel stated it was approximately 11:30 A. M. Starting at 1:30 in the afternoon the defense used one other witness and then called Dr. Gregg to the stand. His direct examina-

tion progressed to the point where the objection to his testimony was sustained. Then appellant's counsel without claiming surprise asked for the recess.

The court refused it because of the recess already granted over the noon hour "for the purpose of permitting the doctor to be present and testify;" and said the appellant "has been in the county jail here some time," and could have been examined any time prior to the trial. Appellant's counsel answered that the appellant was penniless; that they were serving without compensation; that they had no money to pay an expert for an examination; that this was the first opportunity to obtain one "since the appellant has been back in the county jail on this charge;" that the doctor was busy with the operation already mentioned and did not arrive at court until it had started, in consequence of which they could not have him examine appellant during the noon recess.

Realizing the heavy responsibility resting upon us in a case such as this, we are confronted with the statement of the court on the one side and that of appellant's counsel on the other. The latter contains several general statements and conclusions. If appellant's counsel intended to have the doctor examine appellant (before the State's objection was sustained) we cannot understand why they did not apprise the court of their predicament before they put the witness on the stand. Furthermore, there is nothing to indicate they would have been able to prove by the witness any more than they offered to prove. We have concluded we should abide by the discretionary ruling of the trial court, he being in a much better position to know the detailed facts. We therefore overrule this assignment.

█ The final assignment complains of the refusal of appellant's instructions C, D, E and F. Instruction C was on insanity and there was no evidence to support it. Instructions D, E and F submitted irresistible impulse as a ground for acquittal and therefore were erroneous. The four instructions were properly rejected.

Finding no error in the record, the judgment and sentence of death pronounced by the trial court are affirmed. All concur.

Date of execution set for August 16, 1940.