THE STATE v. J. C. JACKSON, *alias* GEORGE CLARK, Appellant.—83 S. W. (2d) 87.

Division Two, April 25, 1935.

*Emanuel Williams* for appellant.

*Roy McKittrick*, Attorney General, and *Wm. W. Barnes*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted of rape in the Circuit Court of the City of St. Louis and his punishment assessed by the jury at death. The court commuted the punishment to life imprisonment in the penitentiary. From that judgment and sentence he appealed. He has filed no brief in this court. There are fourteen assignments of error in the motion for new trial. One of these complains that the verdict was against the evidence and the weight thereof; another of the latitude allowed the circuit attorney in the cross-examination of the defendant; four assign error in the argument of the circuit attorney to the jury; seven complain of the admission of evidence; and one sets up newly discovered evidence. These assignments will be noted in the course of the opinion.

The prosecutrix, Mary Bloom, was an undergraduate nurse twenty-eight years old, who lived at 5003-a Cates Avenue, St. Louis. On January 20, 1932, she advertised in the St. Louis Globe-Democrat for employment as a nurse, stating that she was young and strong and giving her telephone number. Her testimony was that about 5:45 the next morning she received a telephone call. It was a male voice speaking. The person said he desired to engage someone to care for his mother who was sick and a chronic invalid. He gave his address as 5061 Lindell Boulevard in St. Louis. She asked what pay she would receive and the person answered they would discuss that when she came. She agreed to go as soon as she had had her bath and breakfast, and he directed her to come to the side door of the house. Soon thereafter another telephone call came and the same voice informed her she would be paid $125 per month and that she should report in time to permit him to be at his office by seven o'clock. In either the first or second conversation the party told her he would send his chauffeur to meet her where the bus stopped, at Kingshighway and Lindell Boulevard.

The prosecutrix started a little after six o'clock, taking a bus on Kingshighway from Cates Avenue to Lindell Boulevard. The morning was dark and rainy. She wore rubbers, a raincoat and took her parasol. Alighting at Lindell Boulevard she started west

on the north side of the street. She had a small bag containing her uniform. She had gone only a few steps when a negro man approached her from behind and said he was the servant from the house to which she was going. He took her bag and they walked west to number 5061. The negro was the appellant. It was too dark then to tell much about his appearance. Apparently the prosecutrix did not note a similarity between his voice and the voice she had heard on the telephone. She said on cross-examination that his voice on the telephone was disguised, but that answer was stricken out by the court as not being responsive to the question asked her.

The house was of stone, three stories high, with a red roof. The prosecutrix observed that it was vacant. The appellant said, ''The furniture isn't all moved in, and around on the side it is furnished.'' They walked along the west side of the house to a side entrance, which was pretty well back. On the door was a white curtain with blue dots and a blue border. The prosecutrix directed appellant to go in and turn on the lights. He opened the door and immediately pushed her into the dark entrance. Then he put a revolver to her side and held a flash light in front of her, commanding her to go up the steps or he would cut her neck. He also told her he would kill her unless she kept quiet, and pushed her up the steps and back into a vacant room on the east side of the house.

He shoved her over by a window and stood looking at her. She remonstrated with him and he told her he was being paid by the Coleback gangsters to hold her. She tried to go to the door but he caught her and pushed her back against the wall. At that time daylight was beginning to break. He knocked her down on the floor and placed his overcoat over her head, smothering her voice. She tried to scream but was paralyzed with fright. He removed her bloomers and had sexual intercourse with her three times remaining on her for about an hour. During all this time she was begging him to desist. After these acts she says appellant told her he loved her and asked her to come to his house, but to make sure that she did not tell the police, he said he would not call her for a night or two. They went back downstairs and appellant had difficulty in opening the side door. The prosecutrix started to the front door and appellant caught her and told her he would shoot her if she attempted to go out the front way. He made her hold the flashlight for him until he got the side door open, and they walked out to the street some 75 or 100 feet away, he carrying her bag.

It was then a little before eight o'clock. The rain had ceased and it was getting light. The prosecutrix took careful note of appellant's appearance. He was wearing a dark grey overcoat, a greenish-grey cap, dark shoes, dark pants, and a tan sweater. He had a little mustache, was red under the eyes, and had a scar on the left side of his upper cheek and a circular scar by his mouth. She stood

there on Lindell Boulevard for about five minutes talking with the appellant. On the witness stand she explained that she hoped a policeman or someone else would come along, and she wanted to get an accurate description of him. During this time the appellant again talked about having another meeting with her, but would not tell her where he lived. She left him there on the sidewalk, went east to the Kingshighway intersection, and took a bus back to her home on Cates Avenue. There she immediately administered to herself a bichloride of mercury douche and telephoned the police; on their advice the same morning she submitted to a physical examination by Dr. M. T. Morrison, chief physician of the venereal clinic in the division of health of the city of St. Louis.

Dr. Morrison's examination disclosed certain inflamed conditions which indicated there had been complete penetration. The microscopic examination disclosed nothing. There were no bruises or marks on other parts of her body, and no stains on the underwear except dirt stains. On cross-examination the doctor said the condition of irritation or inflammation he found might have been produced by a strong bichloride of mercury douche.

To the police officers summoned immediately after her return to her home Mrs. Bloom gave a description of her assailant. Apparently they connected the appellant with the offense from this description. They had been searching for him since the middle of January upon another charge (of forcing a white woman to live with him) and had gone to the place where he resided, at 4206 Enright Avenue in St. Louis. On the day after the assault upon Mrs. Bloom they searched his room at that address and found a postal card picture of him and a blue sheet of paper on which was written in lead pencil the address "5061 Lindell." This photograph, or an enlargement thereof, was exhibited to the prosecutrix a day or two later and from it she identified the appellant as her ravisher. At the trial appellant objected to the introduction in evidence of the photographs and the piece of paper with the address on it, on the ground that they were obtained without a search warrant in violation of his constitutional rights against unreasonable search and seizure, and that it amounted to his being compelled to give evidence against himself. The appellant was arrested May 19 on description from the photograph. Prosecutrix went to the police station and identified him, and at the trial she pointed him out as the man who had committed the rape upon her. In the account of the assault which she gave to the police she said the room of the house in which the assault occurred was on the third floor. She did not say the appellant drew a revolver or had a razor. She was in an excited state of mind when she gave this account.

One of the officers made a search of the vacant house at 5061 Lindell Boulevard later on the day of the assault. In a room on the

northeast corner of the third floor he found prints where somebody had been lying. The floor was dusty and prints of the back of a human body showed in the dust. There were two of these prints. One extended east and west and the other north and south. They were at right angles to each other.

When the appellant was arrested and questioned by the police he denied committing the assault upon Mrs. Bloom, and said he was at the home of his aunt, Arrie Kent, in East St. Louis on January 21 and that he had been there for several days prior to that date. He fixed the time because he remembered reading in a newspaper an account of the assault and of discussing it with members of the Kent family. He said he had left his abode at 4206 Enright Avenue in St. Louis about January 17 because he was informed by his landlady that a white girl with whom he had been living had been arrested and that the police were looking for him. At the trial he again denied the rape and denied telephoning to Mrs. Bloom. He said he did not know her, and asserted, as before, that he had gone to East St. Louis about January 17 because he had been informed the officers had been to his St. Louis residence looking for him. Up to that time he had been operating as a bootlegger. The officers, he said, asked his landlady if he was living in the house with a white girl. He declared he had never been to 5061 Lindell Boulevard where the rape occurred and asserted he never owned a dark grey overcoat such as Mrs. Bloom had testified he was wearing on that occasion.

With reference to the white girl who had lived with him at 4206 Enright Avenue. He said she stayed with him three or four weeks; but that he met her on the street and she came with him of her own volition, telling him her father was a negro. He declared she came and went as she pleased, being at no time under restraint or compulsion; and that when he learned she was white he telephoned her family at Festus, Missouri, and told them where they could find her. All this detail was gone into by counsel for the State on cross-examination without objection on the part of appellant's counsel, except as to the form of several questions.

On the matter of the appellant's alibi he denied that after going to East St. Louis about January 17 he commuted back and forth between there and St. Louis for the purpose of selling whiskey in the latter city. He admitted that he did come to St. Louis and was in the vicinity of the Community Garage, 5581 Pershing Avenue, about January 24 or 25, and also that he was in St. Louis at the time of his arrest about May 19, but denied that about seven P. M. on January 20 (the day before the assault on Mrs. Bloom) at Clara and Pershing avenues in St. Louis he had walked up to a nurse from St. John's hospital by the name of Miss Frances Black and tried

to induce her to go to 5915 Lindell Boulevard and accept a position as a nurse.

The information was drawn under the Habitual Criminal Statute, Section 4462, charging prior convictions of felonies in the State of Illinois in 1911 and in the State of Iowa in 1919. But at the beginning of the trial the assistant circuit attorney announced and dictated into the record a statement that the State would waive the right to prove the two prior convictions, and would try appellant on the charge of rape under Section 3999, Revised Statutes 1929, and asked the jury to assess the death penalty. Nevertheless on cross-examination of appellant the assistant circuit attorney was permitted to inquire if he had been convicted in the State of Illinois of the charges of burglary and larceny in 1915 and had received a sentence of one to twenty years in the State penitentiary; and whether in 1919 he had been convicted of robbery in the State of Iowa and sentenced to ten years. Appellant's counsel objected on the ground that the State had expressly waived its right to prosecute under the Habitual Criminal Statute. This objection was overruled and appellant admitted both convictions.

The appellant's aunt, Arrie Kent, two cousins, Ardella Shannon and Hicie Northington, and two neighbors of the aunt's, Beatrice West and James Strother, all corroborated the appellant on his alibi defense. In general they testified they had seen him in and around the aunt's home in East St. Louis from about the middle of January on, and most of them said they saw him there on January 21, the day of the rape upon Mrs. Bloom in St. Louis.

In rebuttal the State produced officer Thomas O'Connor of the St. Louis police who testified that on January 23 he went to the home of Arrie Kent in East St. Louis inquiring for the appellant. The officer declared she replied that she had not seen him for over a month, but that he dropped in occasionally to pay a visit. Also, Miss Frances Black, the nurse at St. John's hospital, testified that on January 20 about six-forty-five P. M., while waiting for a University street car at Pershing and Clara avenues in St. Louis the appellant talked to her for about fifteen minutes. On objection by appellant's counsel the court refused to allow her to state what was said in the conversation.

■ I. The first assignment in the motion for new trial is "that the verdict is against the evidence and the weight thereof, in that said evidence was substantially as follows:" Here the motion as printed in the bill of exceptions for about six and one-half pages reviews the evidence, particularly the testimony of the prosecutrix and a police report which was not introduced in evidence. At various places throughout this statement appellant's counsel points out what he regards as improbabilities in the prosecutrix's story, and in-

consistencies with the other evidence. We need only say this assignment presents nothing for review. Without question the State made a substantial showing. The weight and credit to which it was entitled were questions for the trial court and jury, not this court. [State v. Berezuk, 331 Mo. 626, 631, 55 S. W. (2d) 949, 951; State v. Gentry, 320 Mo. 389, 404, 8 S. W. (2d) 20, 27; State v. Thomas, 318 Mo. 843, 850, 1 S. W. (2d) 157, 160.]

■ II. The second, third and fourth assignments in the motion for new trial complain of the admission in evidence of the photographs of the appellant and the piece of paper bearing the address "5061 Lindell," which were found by the police on a search of his room. Appellant contends this was in violation of his constitutional rights under Article II, Section 11 of the State Constitution which forbids unreasonable searches and seizures, and Section 23, Article II, which provides that no person shall be compelled to testify against himself in a criminal cause. There is no merit in these assignments. No motion to suppress this evidence was made in advance of the trial, which occurred a year after the search. The only objection offered was made after the jury had been sworn and the trial was in progress. This was too late. [State v. King, 331 Mo. 268, 274, 53 S. W. (2d) 252, 255; State v. Cox (Mo.), 259 S. W. 1041.]

■ III. In the cross-examination of Dr. Morrison appellant's counsel brought out the fact that the red or discolored condition he found when he examined the prosecutrix a few hours after the rape might have been produced by a strong chemical, such as mercury. The assistant circuit attorney thereupon recalled the prosecutrix to the stand and proved by her that she did take a bichloride of mercury douche when she returned to her home after the assault. Appellant's counsel made timely objection to her testifying a second time, as follows: "I want to object to that for the reason that on direct examination on the part of the prosecuting attorney that question was not raised, and since the witness, under the doctrine of segregation of the witnesses, the witness was seated here in the courtroom, she heard the testimony of the witness in her behalf, and now she attempts to come in here and corroborate that witness." The objection was overruled by the court and the witness permitted to testify. The fifth assignment in the motion for new trial predicates error on that ruling.

We cannot sustain appellant in this contention because there is nothing in the bill of exceptions showing either that the rule excluding witnesses had been ordered enforced, or that the prosecutrix was in the courtroom while Dr. Morrison testified, except the bare statement of these facts in counsel's objection. Indeed, the objection does not say the rule had been ordered enforced, but only that "under the doctrine of segregation of witnesses" the prosecutrix was seated

in the courtroom and heard the doctor testify. This sounds as if counsel thought there was some doctrine requiring the witnesses to be excluded in all cases, which, of course, is not the law. The matter rests within the sound discretion of the trial court. [State v. Compton, 317 Mo. 475, 477, 296 S. W. 137, 138.] If the rule had been enforced there would have been an order to that effect. The bill of exceptions shows none, nor any request for such an order until *after* the prosecutrix had been recalled and completed her testimony. In this state of the record the assignment presents nothing for review. [State v. Sumpter, 153 Mo. 436, 440, 55 S. W. 76, 78; State v. Woodward, 171 Mo. 593, 599, 71 S. W. 1015, 1017; State v. Baker, 318 Mo. 541, 546, 300 S. W. 699, 701.]

IV. The seventh assignment in the motion for new trial is directed to the cross-examination of the appellant. It will be remembered the information was drawn under the Habitual Criminal Statute and charged two prior convictions in other states; but that at the beginning of the trial the assistant circuit attorney announced the State would waive the right to prove the two prior convictions and would ask for the infliction of the death penalty under the rape statute. Nevertheless, in the cross-examination of the appellant over the objections of his counsel the State was permitted to elicit from him the fact that in 1915 he had been convicted of burglary and larceny in Illinois and sentenced to the State penitentiary for from one to twenty years; and that in 1919 he was convicted of robbery in Iowa and sentenced to ten years.

It is hard to tell what the assignment in the motion for new trial on this point means. It asserts the trial court erred in permitting the assistant circuit attorney to ask the above questions since he had waived the right to prove the former convictions; and then continues that in making the inquiry he "did not do it for the purpose as provided by the statute, that is, for the purpose of impeaching his credibility as a witness instead of magnifying his character as a criminal. Said inquisition on the part of said circuit attorney magnified the defendant's character as a criminal and was highly improper and prejudicial and added materially in denying this defendant a fair and impartial trial."

We do not know to what statute the assignment is intended to refer, unless it be Section 1752, Revised Statutes 1929, which provides that a former conviction of a witness "may be proved to affect his credibility, either by the record or by his own cross-examination." Assuming that to have been the intention, we construe the assignment as meaning to charge that the assistant circuit attorney, after having waived the right to prove the former convictions under the Habitual Criminal Statute, nevertheless in bad faith did bring out those facts, not for the purpose of impeaching the credibility

of the appellant as a witness, as authorized by Section 1752, but for the purpose of magnifying his character as a criminal; and that the proof did have that effect and was highly improper and prejudicial.

Neither the record nor the law sustains appellant on this point. When the assistant circuit attorney asked him about his former convictions the objection made by his counsel did not challenge the good faith of the questions. The objection made was that since the State had waived the Habitual Criminal Act it had waived the right to cross-examine the appellant under that act, especially when the matter had not been covered by the direct examination. But Section 3692, Revised Statutes 1929, provides that if the defendant testifies in his own behalf he "may be contradicted and impeached as any other witness in the case;" and it is well settled by numerous decisions of this court that under Section 1752, supra, he may be interrogated concerning former convictions to affect his credibility as a witness, notwithstanding the further provision in Section 3692 which limits the cross-examination of a defendant to matters referred to in his examination in chief. [State v. McBride (Mo.), 231 S. W. 592, 593.]

■ V. The tenth and eleventh assignments in the motion for new trial charge error in the cross-examination of the appellant concerning his living with a white woman in St. Louis. As we have stated, the appellant's defense was an alibi. Before he took the stand four witnesses had testified in his behalf that he had stayed in East St. Louis, Illinois, the latter half of January. Two of them said he told them he had gone there because the officers in St. Louis, Missouri, were after him on a charge of living with a white woman. When the appellant became a witness his counsel asked him why he left St. Louis and for what reason the officers there were looking for him. He answered that his landlady had informed him "the law" had been to the house inquiring if he was living with a white girl, and that she said she had replied she was not aware whether the girl was white or colored but that the girl had said her father was a negro. Then appellant's counsel asked him whether the girl had told him she was a colored girl, and he was not permitted to answer but did say he did not know she was white.

On cross-examination the assistant circuit attorney took up this line of inquiry and asked about his cohabitation with the white girl. Once appellant's counsel objected that it was irrelevant and immaterial; another time, that it was not within the direct examination; and again, that it was repetition. The State's counsel continued at some length, questioning appellant as to the age of the white girl, whether she was kept under compulsion, and the like. To all this appellant answered in a manner favorable to himself, and

his counsel made no objection until the assistant circuit attorney referred to the white girl as a "child." Thereupon appellant's counsel interrupted: "I object to that, Your Honor, please, the question is merely for the purpose of infuriating the jury; there is no evidence at all in this record that she was child; if he wants to ask about the girl, let him ask about the girl without making reference to her as a child, in infancy." In view of this state of the record the appellant will not be heard to complain on either of the grounds stated in his motion: that the cross-examination went beyond the range of the examination in chief; that it tended to impute to the appellant the commission of another crime; and that it was for the purpose of inflaming the jury.

VI. The twelfth assignment is that the trial court erred in admitting the evidence of a Miss Black that she saw the appellant in St. Louis on January 20 and talked with him for about fifteen minutes. Appellant says the testimony was improper because Miss Black was a rebuttal witness and her testimony should have been confined to the fact that she *saw* the appellant—from which we understand appellant's counsel meant to charge that the error consisted in permitting this witness to testify further that she *talked* with him for about fifteen minutes.

There is no merit whatever in this contention. The appellant's defense was an alibi. He had testified that he had been in East St. Louis all of the latter half of the month of January except for one trip back to St. Louis on January 24 or 25. On cross-examination he was asked by the assistant circuit attorney without objection if he had not talked to Miss Frances Black, a nurse from St. John's Hospital, at Clara and Pershing avenues in St. Louis at about seven p. m., on January 20 and endeavored to induce her to accept a position as a nurse at 5915 Lindell Boulevard. The appellant answered that he had not. In rebuttal Miss Black testified that she had talked to the appellant at the time and place mentioned for about fifteen minutes while waiting for a street car. She was not permitted to tell what was said in the conversation. Obviously this was proper in rebuttal to combat appellant's alibi. The State had a right to prove by Miss Black that she had seen and talked to appellant in St. Louis on or about January 21, the date of the rape on Mrs. Bloom, or at any other time during the period when he said he had been continuously away.

VII. The sixth, eighth, ninth and thirteenth assignments in the motion complain of the assistant circuit attorney's argument to the jury. In particular, his references during his closing argument to the appellant's former convictions challenge our attention. Appellant's counsel had wound up his argument with the concluding sentence "Send this boy home." In closing the assistant circuit

attorney said "Talking about this 'boy,' who in 1915 went to the penitentiary in Illinois—." Here appellant's counsel interrupted with this objection: "I object to that or any comment on that, because that is only for the purpose of testing his credibility as a witness, and it is improper to comment on that. I object to any comment." The court overruled the objection and the assistant circuit attorney continued referring severally to the appellant's conviction and prior sentences in Illinois and Iowa. Then he said: "Does it do any good to send a man of his type and caliber to the penitentiary for violating the law, or transgressing upon the law? No, not at all. A man of his type is a menace to society; is a menace to any community, and the sooner you get him out of the way, the better off you will be. Are there any extenuating circumstances in this case that entitle him to anything less than the maximum penalty? No, not at all. That penalty is there for aggravated cases. If this is not an aggravated case I never saw one."

We are constrained to hold this argument was prejudicially erroneous. The assistant circuit attorney was not referring to the credibility of the appellant as a witness. He was talking about his moral character. In that connection he mentioned the appellant's former prison sentences and said it did no good to send a man of that type to the penitentiary; that he was a menace to society and ought to be got out of the way. We consider this line of argument especially flagrant when it is remembered that the assistant circuit attorney at the beginning of the trial had announced he would waive the right to prosecute under the Habitual Criminal Statute and would ask for the ·death penalty under the rape statute, Section 3999. But the punishment under this section also ranges down to a minimum of two years' imprisonment in the penitentiary. The State's election not to invoke the Habitual Criminal Statute was tantamount to a declaration that it would not seek aggravation of the punishment because of the former convictions, but would proceed against the appellant under the statute applicable to first offenders. And yet, after eliciting from appellant the admission that he had been convicted of felonies in Iowa and Illinois—for the sole purpose of affecting his credibility as a witness—the assistant circuit attorney played it up prominently in his closing argument as a reason for the infliction of the supreme punishment of death.

This abuse of the appellant's legal rights calls for the reversal and remanding of the case. In State v. Jones, 249 Mo. 80, 99, 155 S. W. 33, 37, this court quoted with approval a Texas case where the county attorney in argument said the following, among other things: "The only punishment you can give this negro bully is to end his earthly career. If you send him to the penitentiary, it will not reform him. He has been in the penitentiary for assault to murder, and it has had no effect on him." The Texas Court

of Criminal Appeals said: "The language of the county attorney in his argument to the jury . . . was highly inflammatory and prejudicial to the rights of appellant." Again, in State v. Wellman, 253 Mo. 302, 319, 161 S. W. 795, 800, this court said: "The prosecutor should never be allowed to appeal to the jury to convict the defendant because he has committed some other crime not in any way connected with the one for which he is being tried, or because his reputation is bad. A defendant who testifies in his own behalf in a criminal case occupies a dual role. In one role he is a witness, in the other a defendant." [See, also, State v. Jones, 306 Mo. 437, 449, 268 S. W. 83, 86.]

It is true that after the jury had returned their verdict fixing the punishment at death the court commuted the punishment to life imprisonment, and that this latter punishment could have been assessed by the jury under the Habitual Criminal Statute. But that does not cure the error. The State did not proceed under the Habitual Criminal Statute or make all the proof necessary thereunder, and the jury had the discretionary right to impose a punishment as low as two years' imprisonment in the penitentiary. Obviously we cannot speculate upon what their verdict would have been if the prejudicial argument had not been made, and assume they would have assessed the punishment at life imprisonment.

The appellant also complains of the assistant circuit attorney's argument where he said, "A black man assaulting a white woman in a vacant house at an early hour in the morning." The motion says this statement was made with peculiar emphasis for the purpose of prejudicing the jury and that it had that effect. The bill of exceptions does not show the emphasis with which the statement was made, and the objection interposed at the time did not complain of it on that ground. What appellant's counsel said was, "I wish to object to that statement as being highly improper, and ask that a mistrial be declared (and that) this jury be discharged." Where the color or race of the parties has a factual bearing on the issues, a reference thereto comes within the range of legitimate argument. But appeals to racial prejudice are prejudicial and many times have been held reversible error. [78 A. L. R., p. 1442, note.] In our opinion the remarks of the assistant circuit attorney complained of here were open to objection.

Further, the assistant circuit attorney was discussing the attitude of the appellant's aunt, Arrie Kent, an alibi witness. He referred to the fact that she denied telling officer O'Connor on January 23, when he went to her home in East St. Louis and questioned her, that the appellant was not there and that she hadn't seen him for some time. Officer O'Connor in rebuttal testified to the contrary. The assistant circuit attorney denounced her testimony as perjury. He

had a right to draw this conclusion from the conflicting testimony and to express it in argument.

Appellant's motion further sought a new trial on the ground of newly discovered evidence. We need not go into this assignment since the case is to be remanded for a new trial.

For the reasons given the judgment and sentence are reversed and the cause remanded. All concur.