STATE of Missouri, Respondent,

v.

Delbert CORNETT, Appellant.

No. 50053.

Supreme Court of Missouri,
En Banc.

Sept. 14, 1964.

Thomas F. Eagleton, Atty. Gen., Eugene G. Bushmann, Asst. Atty. Gen., Jefferson City, for respondent.

Ted M. Henson, and John A. Casey, Poplar Bluff, for appellant.

STORCKMAN, Judge.

The defendant was convicted of first degree murder and the jury assessed the death penalty. His motion for new trial was overruled and he has appealed. There is no contention that the conviction is not supported by the evidence. The nature of the questions presented are such that an extended statement of the facts is not required.

On September 2, 1962, the body of William Rue Bryant was found near the Black River about a mile and a half south of Poplar Bluff. There were seven stab wounds in Mr. Bryant's chest and upper abdomen, several of which penetrated vital organs and caused his death. Mr. Bryant's billfold with no money in it was found near the body. His automobile was found on a salvage lot near Campbell, Missouri. There were blood stains on its front seat.

About four o'clock in the afternoon of the same day that the body was found, the defendant and Richard Macom were arrested. Several hours after the defendant was arrested, he signed a written confession which was introduced in evidence. Since it gives the complete story of the occurrence, the

confession is set out in full, omitting the caption and signatures:

"I Delbert Cornett give the following statement to Sgt. Howard I. Rhodes, Sheriff Lester Massingham, Trooper F. A. Findley and Chief of Police Eldon Whitworth, reference the death of William Rue Bryant. I have been advised of my Constitutional rights and have not been threatened or made any promises.

"I was dispatching that night for Ed Smearbaugh and we closed the station about 12:00 or 12:30. I put the day's receipts in a box and this fellow drove up and ask Richard Macom if he could get him a bottle. They left in this fellow's car and I set there on a step until they returned. Biff Joiner sat there with me. When Richard and this man returned they turned in the driveway and Richard bought two drinks of whiskey from the man, one for him and one for me. He gave him a half dollar for it. I got in the back seat of the car with this fellow and Richard and we left under the pretense of getting another bottle. We went down to South Poplar Bluff, and we come to the conclusion of robbing the man.

"We turned off on Ashcroft Road and I taken my pocket knife out and put it on his neck and asked him for his billfold. He put up a struggle and I cut him for the first time. We went farther on down the river road and stopped and asked him to get out of the car. I cut him another time there and he staggered and fell down. Richard Macom asked for the knife then and he started stabbing him. I said that we were going to have to kill him, then Richard cut his throat I think. I told Richard to cut his throat, and Richard told me that he tried to cut his head off his shoulders.

"I then told Richard that we would have to take the car and get rid of the son of a bitch. At that time Richard threw my knife away and we got in the car and went to Campbell, and left the car in a salvage lot. We then walked into Campbell, and called a cab from Poplar Bluff to come out and get us.

"Marvin Chatman is the cab driver that picked us up in Campbell, and brought us back to Poplar Bluff, and let us out at the Crown Hotel. We bought a half pint of whiskey at the Crown and left there and went to my house where Richard burned his bloody trousers in a little King heater stove in my house. Then he put on a pair of my trousers and went to his home.

"After Richard left I layed down and tried to sleep but couldn't. I got so nervous that I went to my mothers house and told her that I had to tell her something and then told her that I thought Richard and I had killed a man. We then called Mrs. Macom and she come over to mother's house and we told her about it. A short time later I went over to Macom's house and told Richard's brothers about it, that was Roy and Freddy Macom."

The only witness for the defense was Dr. Marvin Barbour of Poplar Bluff who had been engaged in the general practice of medicine for about ten years. He examined the defendant with reference to his mental status and neurological functioning for about an hour a couple of days before the trial. The examination revealed no definite abnormality, but the defendant's history suggested a possibility of the existence of some organic disease of the central nervous system. There was no evidence of recent injury, but there was a history of brain concussion and a head injury in the past which could possibly produce changes in the brain that would cause the behavior encountered in questioning the defendant. From his examination the doctor was not able to determine if the defendant knew the difference between right and wrong but was of the opinion that the defendant should be examined and tested by someone more qualified than he was.

The defendant and Richard Macom were charged in the same information with first degree murder. Macom was granted a severance and pleaded guilty to the charge of first degree murder. The sentence imposed is not shown by the record. The de-

fendant was tried alone, found guilty and sentenced to suffer the penalty of death.

The questions presented on appeal relate to statements made by the court to the jury during its deliberations concerning the time the defendant would serve if given a life sentence, the refusal of the court to excuse a juror who stated on the voir dire examination that he had formed an opinion as to the guilt or innocence of the defendant, and the propriety of one of the instructions given.

About thirty minutes after retiring to consider its verdict, the jury was brought back into the courtroom and the following dialogue occurred between the court and the foreman of the jury:

"THE COURT: Gentlemen, the Sheriff tells me that you wanted to ask me a question. I don't know whether I can answer it or not.

"MR. KALKBRENNER: The question we want to ask you is what do you mean by natural life, does that mean every day or does that mean he can be paroled?

"THE COURT: That is up to the Board of Pardons and Paroles. I don't think we have any say so over that. Do you gentlemen either one of you have any objection to me making that explanation?

"MR. HENSON: They have got the instructions.

"THE COURT: You will have to go by the instructions. We can't foresee what will happen in the future. It is the province of the Jury to pass on the guilt or innocence and fix his punishment. Now, what happens thereafter of course is out of the hands of the Jury and the Court or anybody else. So I don't think that maybe helps you, but that is all I can tell you. You have to be guided by the instructions and let the future take care of it."

The jury again retired and after another thirty minutes it returned its verdict finding the defendant guilty and assessing the death penalty. The defendant contends that the court's oral statement or instruction to the jury constituted prejudicial error in that it improperly influenced the jury to assess the death penalty.

The state asserts the question is not preserved for review because the defendant did not object to the remarks of the judge. It is apparent that the defendant did not have an opportunity to object before the court made his first response to the juror's question. The case is unlike State v. McGee, 361 Mo. 309, 234 S.W.2d 587, 591[9], where the court consulted with counsel and obtained consent before answering. Such a situation at best is a difficult one for counsel. When given an opportunity, defendant's counsel indicated that the court should not go beyond the written instructions which the jury had. The occurrence was also specified as a ground in the defendant's motion for new trial. Supreme Court Rule 79.01, V.A.M.R., inter alia, provides that it is sufficient for the purpose if a party, at the time the ruling or order is made or sought, makes known to the court the action which he desires the court to take or his objection to the action and his grounds therefor. Considering the time, manner, and circumstances of the occurrence, the trial court was adequately apprised of the error claimed and the question is preserved for review. State v. Keller, Mo., 344 S.W.2d 65, 66 [2].

The state cites several cases where questions concerning parole or reduction of sentence were answered with the consent of counsel and sometimes with active participation of counsel, such as State v. Stidham, Mo., 258 S.W.2d 620, State v. Crofton, 271 Mo. 507, 197 S.W. 136, State v. Shipman, 354 Mo. 265, 189 S.W.2d 273, and State v. Ackerman, 315 Mo. 219, 285 S.W. 739. Such cases are not controlling here. Nor is this a case where the court declined to answer the question or merely admonished the jury to disregard the matter and to adhere to the written instructions and the evidence in the case. The

state also relies on State v. Richardson, 137 Kan. 38, 19 P.2d 735, where the trial judge in the presence of defendant's counsel told an inquiring juror that punishment could be made to run consecutively or concurrently on each count of the petition, but it was a matter for the court and not for the jury. The interchange was held not to be prejudicial error. But in the case at bar, the jury was required to assess the punishment and not the court. The Richardson case is not persuasive in the circumstances of this case.

It has been held improper for a prosecutor in oral argument to call the jury's attention to the possibility that a defendant may be released from imprisonment by parole or some similar procedure as a reason for imposing a greater penalty to compensate for such prospective mitigation. State v. Kaempfer, 342 Mo. 1007, 119 S.W. 2d 294, 296[6]; 23A C.J.S. Criminal Law § 1107, p. 208. Likewise, an instruction that the sentence imposed by the jury may be lessened by the executive branch of the government has been held to be erroneous. 23A C.J.S. Criminal Law § 1290 p. 706, n. 44.

■ We have found no Missouri case precisely in point but the rule supported by the better reasoning is that it is error for the trial court to inform the jury that the sentence imposed by its verdict may be diminished by parole or some similar procedure not administered by the judicial branch of government. State v. Beedle, Mo., 180 S.W. 888, 889–890[2]; 23A C.J.S. Criminal Law § 1379, p. 1012; People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, 46–47[7, 8]; Coward v. Commonwealth, 164 Va. 639, 178 S.E. 797, 798[2, 3]; Jones v. Commonwealth, 194 Va. 273, 72 S.E.2d 693, 35 A.L.R.2d 761; Berry v. State, 107 Ga.App. 643, 131 S.E.2d 115; Bean v. State, 58 Okl.Cr. 432, 54 P.2d 675, 676–678[1, 2]; Ringo v. Commonwealth, Ky., 346 S.W.2d 21. The cases cited from other states are typical of those taking this view. What was said in Coward v. Commonwealth is applicable to the situation in the instant case:

"The power of the Governor to pardon should not be commented upon in argument, and it is plain error to tell the jury that under an established rule and in the ordinary course of events such sentence as it may impose will not be suffered, but will be substantially diminished. In the instant case, this is what the jury wanted to know, and its purpose in seeking information is too plain for argument. These jurors should have been told that it was their duty, if they found the accused guilty, to impose such sentence as seemed to them to be just. What might afterwards happen was no concern of theirs. In its failure to do this, we think the trial court was in error. For this reason its judgment must be reversed, and it is so ordered." 178 S.E. 800. The asking of such a question by a juror presents a difficult situation, but the response suggested in Jones v. Commonwealth, supra, is worthy of consideration; it is that "it is the duty of the jury if they find the accused guilty to impose such punishment as they consider to be just under the evidence and within the limits stated in the court's instructions; and that they must not concern themselves with what may afterwards happen." 72 S.E.2d 694. See also State v. Quilling, 363 Mo. 1016, 256 S.W.2d 751, 754[9]. In People v. Morse, supra, the California Supreme Court made a comprehensive review and reappraisal of the problem presented by the jury's concern with the lessening by others of the punishment assessed by its verdict.

The statement is not rendered harmless by reason of the further statement of the court to the effect that the jury must be guided by the instructions and let the future take care of itself. The situation is similar to that described in Ringo v. Commonwealth, supra, as follows: "Throughout the proceedings the judge sought to protect the appellant and in doing so inadvertently informed the jury, in answer to its question, that the appellant would be

eligible for parole in about eight years if given a life sentence. He immediately tried to rectify the error by admonishing the jury: 'I am not allowed to give you that information. That is a matter for the parole board to decide. Return to the jury room and decide the case under the instructions.'" 346 S.W.2d 21.

The record discloses an unorthodox situation which buttresses our conclusion that the error was not harmless. The jury was present at the argument of the motion for new trial; for what reason we do not know. But the record shows:

"MR. HENSON: Now, the Defendant objects to the argument on the Motion for New Trial, in the presence of the Jury that tried the case and rendered the verdict in this case.

"THE COURT: For what reason?

"MR. HENSON: For the reason that it is prejudicial.

"THE COURT: It may be, but your objection is overruled. They are through with it. Go ahead Mr. Casey with your argument."

The presence of the jury at such a time seems unfortunate in that it might tend to hamper a free and thorough discussion of the motion. Thereafter, in ruling on the motion, the court stated:

"THE COURT: Now I have gone over the motion filed for new trial, and while there may be some points there that the appellate Court might feel would be, would justify granting a motion for new trial, I do not feel like granting the motion. Therefore, I am overruling the motion for new trial, which was heretofore filed in this case."

After the formal sentencing this sequence occurred:

"MR. CASEY: I would like to have something put in the record. I have, prior to this date, and I just talked to Mr. Cornett, and volunteered my services to ap-

peal this case. Mr. Cornett advises me that he does not want to appeal it, and due to the seriousness of the offense I think that I would like for Mr. Cornett to make that remark, or state here in open Court for the record, that he does not want me to appeal the case.

"THE COURT: Mr. Cornett, in view of what Mr. Casey has said, I would like to state to you that it is my opinion in a case as serious as this is, and the responsibility of Mr. Casey, who was appointed by the Court, who appears here with you, and in view of the fact that he has offered his services and since you are without funds, and in view of the further fact that an appeal can be made without any expense to you, I feel that you should authorize him to appeal this case and let the Supreme Court pass on it. Now, I suppose you have the right to refuse his services and to tell him that you do not wish to appeal it, but I am asking you now in open Court here, and at this time, when Court is in session, in the presence of him and the officers and the people who are here in the Court Room, whether or not you will permit Mr. Casey to appeal your case to the Supreme Court, or if you insist that it not be done?

"MR. CORNETT: Well, I really don't see no use appealing it and prolonging it any more, when the Supreme Court would uphold the sentence and let it go as it is.

"THE COURT: We don't know that the Supreme Court will do that, but anyway now, you have heard Mr. Casey's statement, and you heard what the Court has said, and I would like for you to very seriously consider it between now and the time that Mr. Massingham takes you to Jefferson City next Wednesday, and I want you to talk to your folks and think about it. And as I say, he is perfectly willing to do it, and it can be done without expense to you. The Court feels like it should be done and let the Supreme Court, who has had far more experience than I have, pass on it. So you think about it between now

and then, and Mr. Casey will contact you now sometime before you leave.

"MR. CORNETT: Yes, sir.

"THE COURT: And let me know what you want to do.

"MR. CORNETT: Your Honor, I would like to thank each and every one of the Court attaches for the generosity and the kindness and goodness of their hearts that they have given me through this trial.

"THE COURT: Well, it is unfortunate for everybody of course that this happened. You could have entered a plea of guilty and the Court would have assessed your punishment at life imprisonment, but the Court was advised through your attorneys that you did not want that done, that you would enter a plea of guilty if you felt the Court would assess the death penalty, which I felt like that just one man on a plea of guilty, did not want to do. So you think it over Delbert, and Mr. Casey will contact you.

"MR. CORNETT: Yes, sir."

■ The defendant did consent to the appeal; it goes without saying that the appeal should be ruled according to law regardless of the defendant's desires in the matter. The defendant did not testify and in view of his confession and other evidence in the case, the nature and extent of his punishment was perhaps the most important issue in the case. In the circumstances of this case, the error was prejudicial to the defendant on this important issue and his motion for a new trial should have been granted.

■ The other two matters urged are not likely to happen again on retrial and need not be ruled. In passing, however, it may be observed that it would be the better practice in a case of this sort to excuse a juror who states he has formed an opinion unless subsequent examination discloses unequivocally that he will be guided solely by the evidence. In redrafting its instructions for retrial, the state will do well to consider the objections made against instruction 3 in the present case.

The judgment is reversed and the cause remanded.

EAGER, C. J., and LEEDY, HOLMAN and HENLEY, JJ., concur.

DALTON and HYDE, JJ., dissent.