STATE of Missouri, Respondent,

v.

Earl Eugene NICKENS, Appellant.

No. 50718.

Supreme Court of Missouri,
En Banc.

June 13, 1966.

Norman H. Anderson, Atty. Gen., James J. Murphy, Asst. Atty. Gen., Jefferson City, for respondent.

J. Paul Allred, Jr., David L. Campbell, William D. Mykins and Martin Schiff, Jr., St. Louis, Jules B. Gerard, St. Louis, of counsel, for defendant-appellant.

HENLEY, Judge.

Defendant appeals from a judgment and sentence imposing the penalty of death. He was charged by indictment in usual and common form with murder in the first degree and tried as having committed homicide in the perpetration of robbery. Section 559.010, RSMo 1959, V.A.M.S. His plea was: "not guilty by reason of mental disease or defect excluding responsibility." Section 552.030, paragraph 2, RSMo 1959 (1965 Cumulative Supplement), V.A.M.S. A jury found him guilty and, as indicated, assessed his punishment at death. Section 559.030, RSMo 1959, V.A.M.S.

Defendant has been ably represented by the same court-appointed counsel throughout all proceedings, including arraignment, pre-trial hearings on motions to suppress evidence and to dismiss the indictment, a trial in June, 1963, resulting in a mistrial due to illness of defendant, a six-day trial in December, 1963, resulting in his conviction, and briefing and extended oral argument in this court.

Two closely related assignments of error briefed by defendant dictate that the case be reversed and remanded for another trial. Therefore, a brief summary of the evidence will suffice.

On March 4, 1963, at about 2:20 P.M., defendant, with a pistol pointed at his victim, held up and robbed Mrs. Maxine Butler in her grocery store located at the southwest corner of Chippewa and Illinois Streets in the southern portion of the City of St. Louis, taking approximately $100 and a carton of cigarettes. Leaving the scene of this robbery, he drove in his automobile

in a general northwestwardly direction. In the meantime the police were notified and given a description of the robber and his vehicle. As defendant turned left off of Grand Avenue onto Castleman Avenue (3.2 miles northwest of the scene of the robbery and about 20 or 25 minutes thereafter), he was stopped by Police Officer Donald Sparks, who was driving a marked police car. Defendant pulled to the north curb of Castleman and stopped fifty or so feet west of Grand near a beauty shop in the Saum Hotel. The police car pulled to the curb at an angle and stopped behind defendant. As Officer Sparks alighted from the left side of the police car defendant, sitting at the steering wheel of his automobile, fired three shots at the officer with a .38 caliber pistol. Two of these bullets struck the officer in the head inflicting wounds from which he died within two hours; the third struck and deflated the left front tire of the police car. The officer's body, with his pistol still secure in its holster, was found lying in the street parallel to the left side of the police car. Escaping this scene, defendant drove northwestwardly to a parking lot on Vandeventer Avenue where he abandoned his automobile and walked to a nearby tavern known as Crest Lounge at 1640 south Vandeventer. There he ordered a beer and asked the waitress to call a taxicab for him. Leaving the tavern by Laclede Cab he rode to Kingshighway and Lindell Boulevard, got out, and walked to his residence about a block away at 4220 Maryland Avenue. He was arrested there by police at about 4:30 P.M.

As stated, his defense was not guilty by reason of mental disease or defect excluding responsibility for the acts with which he was charged. Whether he suffered such disease or defect was the primary, if not the sole, issue in the case. In support of this defense he offered the testimony of Dr. Robert L. Lam, a neurologist and psychiatrist appointed by the court on defendant's request. Dr. Lam testified, in substance, that, on the date of this offense and prior thereto, defendant was suffering from a mental disease known as paranoid schizophrenia or, described in a layman's terms, a split personality; that by reason of this mental disease, defendant was unable to appreciate or understand the significance, nature or quality of his acts and unable to conform his conduct to the requirements of law both at the time of the robbery and at the time of the shooting of Officer Sparks. In rebuttal the state offered the testimony of Dr. James N. Haddock, also a psychiatrist, who had examined defendant at the state's request.

Dr. Haddock testified, in substance, that his examination disclosed no evidence that defendant suffered from any degree of psychotic disturbance, including any form of schizophrenia, paranoid disorder, affective disorder, or organic disorder either on the date of the killing of Officer Sparks or at any time prior thereto; that defendant did not suffer from paranoid schizophrenia; that defendant has, and has had for sometime, " * * * a severe character disorder also known variously as [a] psychopathic, sociopathic, or anti-social personality * * manifested by repeated criminal acts * * and * * * anti-social behavior * * *;" that at the time of the robbery and killing defendant knew and appreciated the nature, quality and wrongfulness of his conduct and was capable of conforming his conduct to the requirements of law.

These opposite medical opinions are based on essentially the same type of subjective and objective examinations of the defendant by each of the doctors. In the course of their testimony each of the doctors related to the jury defendant's history of repeated criminal acts resulting in convictions and jail, reformatory and prison sentences, and an undesirable discharge from the Navy. This historical information was acquired by each doctor during the course of his examination of defendant. As required by § 552.030, paragraph 4, the court, both orally at the time of its admission and

later by instruction, informed the jury that it must not consider such information as any evidence of the guilt of defendant.

While testifying in narrative form from a written report of his examination of defendant, Dr. Haddock was interrupted by an objection from defendant made in anticipation of his reading the following portion of his report:

"* * * Treatment or rehabilitation of the type of disorder shown by this man would be of no avail with the methods available today. If unrestrained further anti-social acts by this man will undoubtedly recur in the same way as in the past."

Out of the hearing of the jury, defendant objected and asked the court not to permit the doctor to read the above-quoted portion of his report for the reasons that it was irrelevant and immaterial to the issue of whether defendant was suffering from a mental disease at the time of the act charged, and that the testimony would be highly prejudicial in that it constituted a prognosis of what defendant's future conduct would be if unrestrained. The court first sustained the objection and then, after a colloquy between court and counsel, reversed its ruling and permitted the doctor to read these two sentences as a part of his testimony. It was understood between the court and counsel for defendant that when the doctor reached this portion of his report defendant's objection would be considered as renewed and, along with a motion for a mistrial, overruled.

In his closing argument counsel for the state was permitted, over defendant's objection, to argue:

"* * * He [referring to counsel for defendant] says, 'My God, you may come back some day and say, "My God, what have I done?"' All of this, of course, is to throw some kind of a scare into you that you might do the wrong thing and all the rest of that nonsense.

"He reads you an instruction that says that this defendant will—if you find him not guilty by reason of mental defect—will go to a hospital until such a time that there is a hearing and some doctor will have to testify that he is all right again. Well, we've already had one doctor today, or yesterday, who already testified that he's not psychotic; should be no problem to get some other problem—to get some other doctor somewhere now that he's not—that he has no psychosis. And, when next week, next month, next year, five years from now, ten years from now, when—and when he gets back on the street again, a man with this kind of a sickness; that is to say a psychopath, a repeater, a man with this kind of a mind; that is to say an anti-social, a sociopath, a character disorder—what does Dr. Haddock say about him? Treatment or rehabilitation of the type of disorder shown by this man will be of no avail with the methods available today. If unrestrained, further anti-social acts by this man will undoubtedly occur in the same way as in the past.

* * * * * *

"And if unrestrained, further anti-social acts by this man will undoubtedly recur in the same way as in the past and we—are we to say now the same type of boogie man he throws up; are we to say after he hits the street again, 'My God, what have I done?' Who do we say that to—the next widow? Who do we say that to when we say, 'My God, what have I done?'

"This man has no mental disease. This man is a repeater and in that sense he has a character disorder and nothing more. This man is guilty of Murder in the First Degree in the shooting and assassination of that officer."

Defendant contends that the above-quoted testimony of Dr. Haddock "* * * was wholly irrelevent and immaterial to any issue of the case, was highly inflammatory, and was calculated to induce the jury to assess defendant's punishment at death through fear rather than reason." He says that the issue is his mental condition *at the time* of the commission of the alleged of-

fense [1] and that although great latitude is allowed in the admission of evidence where the defense is "not guilty by reason of mental disease", it is not wholly unlimited and is restricted to evidence relevant and material to the issue of his mental condition *at the time* of commission of the act charged.[2] The authorities cited by defendant and listed below, as well as many others, so hold. In State v. Tarwater, cited in Footnote 2, this court said at l. c. 486 of 239 S.W.: "No limitation is fixed by law as to the time within which the inquiry as to the mental condition of accused is to be directed, but the facts admitted in evidence should be restricted to those which have some tendency to show the mental condition of accused *at the time of the commission of the act charged, as that is the ultimate fact to be proved under a plea of insanity.*" Defendant contends that the great latitude allowed in the admission of evidence where this defense is interposed does not extend to the admission of opinion evidence that his mental condition (that is: a character disorder; not a mental disease or defect excluding responsibility) was such that he would *in the future* commit other crimes if unrestrained; that this evidence had no tendency to show his mental condition at the time of the commission of the act charged. He argues that on the contrary this evidence served to concern the jury with his criminal proclivities and potential for further crime and thereby deprived him of his right to be tried solely for the offense with which he was charged; that this evidence served to impress on the jury that he would, if acquitted, commit the same type of crimes (including the killing of a policeman) and was thus so prejudicial and inflammatory as to deny him impartial consideration of the proper issues.

The state contends that this testimony was relevant to the issue of defendant's mental condition at the time of the commission of the offense charged, because it refers to the *permanence* of that condition, an abnormal condition excluded by § 552.010 as not a mental disease or defect; that is, that the testimony was merely a diagnosis of an existing condition and its extent. We experience no difficulty understanding the first sentence of this testimony as a description or diagnosis of a condition existing at the time of the commission of the act charged. But we experience considerable difficulty with, and cannot, as the state would have us, equate the second sentence solely with a description of an existing condition. It is not a diagnosis; it is more a prognosis, a positive forecast by a medical witness, an expert whose testimony would no doubt weigh heavily with the jury, that one whom he has described as having no more than a character disorder, an habitual criminal, will again commit crime if set free.

■ The issues for determination by the jury are: first, whether defendant had a mental disease or defect at the time of the commission of the offense charged; and, second, if so, whether the disease or defect was such as would exclude responsibility for his act. If the jury determines that he did have a mental disease or defect excluding responsibility for his act, then its function ceases except to acquit him for that reason. If he is so acquitted, the court shall order him committed to the custody of the director of the division of mental diseases. Section 552.040. Such acquittal makes his restraint mandatory because he *has* a mental disease or defect excluding responsibility. Note that Dr. Haddock says that he *does not have* such disease or defect.

■ However, if the jury determines that he did not suffer from a mental dis-

---

1. Section 552.030, paragraph 1, RSMo 1959 (1965 Cumulative Supplement), V.A.M.S.; State v. Brizendine, Mo., 391 S.W.2d 898, 901–902 [2–4]; State v. Moore, Mo., 303 S.W.2d 60, 69 [11].

2. State v. Moore, supra; State v. Jackson, 346 Mo. 474, 142 S.W.2d 45, 48–49 [2–4]; State v. Tarwater, 293 Mo. 273, 239 S.W. 480, 486 [17].

ease or defect excluding responsibility for his act at the time of its commission, the jury must take one further step. That is, if the jury finds him guilty, it must then assess his punishment.

■ The doctor may express an opinion to aid the jury in determining the first and second issues, but when he expresses his opinion that the accused does not have a mental disease or defect excluding responsibility, his function as an expert stops; it does not extend to recommending punishment. His function as an expert does not extend to expressing an opinion that an accused should be restrained or imprisoned even for the offense with which he is charged. That determination is the exclusive function and province of the jury. The jury may not take into consideration what defendant may or will do in the future in determining either guilt or punishment for the offense for which he is on trial. Certainly then this expert should not be permitted to express an opinion as to defendant's potential for crime, that he "undoubtedly" will commit similar crimes in the future "if unrestrained."

■ "Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible * * * For the purpose of determining whether or not the defendant, if found guilty of a capital offense, shall be sentenced to death or life imprisonment"[3]; however, evidence that one did not suffer from a mental disease or defect excluding responsibility but should be imprisoned lest he commit crimes in the future, lest he commit "* * * further antisocial acts [which] will undoubtedly recur in the same way [murder, robbery, larceny?] as in the past", is highly prejudicial to defendant's right to be tried only for the offense with which he is now charged and is not admissible.

■ Defendant contends that the above-quoted portion of the closing argument of counsel for the state, as an appeal to the jury to convict and impose the death penalty, was highly prejudicial to his defense of "insanity"; that the court erred in permitting counsel so to argue. He says this argument cast him as a potential threat to society and was designed to engender fear in the minds of the jury that if he were acquitted on his defense of insanity, he soon would be discharged to kill again.

The state contends that this argument was proper response and retaliation to argument of defense counsel. In his argument, counsel for defendant referred to an instruction given by the court. This instruction informed the jury, in substance, that if they found defendant not guilty by reason of mental disease or defect excluding responsibility, it would be the duty of the court to order him committed to the custody of the director of the division of mental diseases; that he could be released from such commitment only on order of the trial court after a determination by that court that he did not then have and was not likely to have a mental disease rendering him dangerous to himself or others or unable to conform his conduct to the requirements of law.[4] In considering a similar closing argument by counsel for the state this court said in State v. Johnson, Mo., 267 S.W.2d 642, l.c. 645–646:

"The argument of counsel for the State culminating in his telling the jury defend-

---

3. Section 552.030, paragraph 3(2), RSMo 1959 (1965 Cumulative Supplement) V.A.M.S.

4. In State v. Garrett, Mo., 391 S.W.2d 235, 240–242 [3], decided after the instant case was tried, this court held that the trial court properly refused to give a like instruction requested by the defendant; that "Such an instruction has no legitimate bearing on any fact issue which the jury must decide; * * * [and] would divert the jury from the real merits of the insanity issue by the introduction of this extraneous consideration [of the result of an acquittal by reason of insanity]." Note the observation at l.c. 242 as to the type of controversies the court said may arise (and did arise in the instant case) in final arguments if the jury is permitted to consider the result of its acquittal by reason of insanity.

ant would be out in two months was urged without reference to the jury's consideration of the evidence tending to prove or disprove that defendant was insane. The argument was used in such a way as to urge the jury to convict defendant even though the jury may have believed from the evidence that defendant was insane. In effect the whole of the quoted argument tended to incite the jury, in making their choice between conviction and acquittal on the ground of insanity, to ignore defendant's legal defense of insanity and the evidence in support or refutation thereof and to convict, and to ignore and disparage (although the jury may have believed defendant was insane), the law making provision for the jury's findings when a defendant is acquitted on the sole ground of his insanity, Section 546.510 RSMo 1949, V.A.M.S. And, in support of the argument to convict, State's counsel was attempting to engender in the minds of the jurors the fear that if defendant were acquitted on his defense of insanity, defendant would be soon discharged to rape again. We are of the opinion that the quoted argument of State's counsel was not in legitimate retaliation to the argument of defendant's counsel quoted supra; and we believe that the trial court's failure to sustain the objection of defendant's counsel and to take proper action to purge the prejudicial effect of such argument was reversible error." Also see: State v. Cornett, Mo., 381 S.W.2d 878.

What was said in Johnson, supra, is particularly appropos here. We hold that this argument was not proper response and retaliation to argument of the defendant; that it was an appeal to the prejudices of the jury for a conviction and the death penalty; that it was highly prejudicial to the defense of insanity; and, that the court erred in permitting counsel so to argue.

▮ There is another facet to the state's closing argument that calls for reversal and remanding of the case. Counsel twice

described defendant as "a repeater", thus referring to his prior convictions as a reason for conviction and imposition of the death penalty. This argument was in the face of the statute [5] and the court's instruction that such information received by Doctors Lam and Haddock from defendant and related by them to the jury was admitted in evidence solely on the issue of defendant's mental condition and was not to be considered by the jury as any evidence of his guilt. The defendant did not take the stand, so there can be no contention that this argument referred to his credibility as a witness. This evidence of defendant's prior convictions was elicited from the doctors as a part of defendant's history and background as an element to be considered in determining his mental condition at the time of the commission of the act charged. It was elicited solely for that purpose; it was admissible from these witnesses solely for that purpose; and it could be considered by the jury solely for that purpose. To refer in argument to evidence elicited for this exclusive purpose as a reason for conviction or imposition of the maximum punishment is an abuse of defendant's rights. A similar situation arose in State v. Jackson, 336 Mo. 1069, 83 S.W.2d 87, 93–94, 103 A.L.R. 339 [9]. In Jackson, the defendant was charged with rape; the state's attorney announced at the beginning of the trial he would waive the right to prosecute under the habitual criminal statute and would ask for the death penalty under the rape statute; evidence was elicited from defendant that he had been convicted of prior felonies. This court said at l.c. 94: " * * * The state's election not to invoke the habitual criminal statute was tantamount to a declaration that it would not seek aggravation of the punishment because of the former convictions but would proceed against the appellant under the statute applicable to first offenders. And yet, after eliciting from appellant the admission that he had been convicted of felonies in Iowa and Illinois—

---

5. Section 552.030, paragraph 4, RSMo 1959, (1965 Cumulative Supplement), V.A.M.S.

for the sole purpose of affecting his credibility as a witness—the assistant circuit attorney played it up prominently in his closing argument as a reason for the infliction of the supreme punishment of death." The court said this line of argument was a flagrant abuse of defendant's legal rights and reversed and remanded the case. Also see: State v. Mobley, Mo., 369 S.W.2d 576, 579–581 [1–6]; State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, 526–529 [1–6]; State v. Baber, Mo., 297 S.W.2d 439, 442–443 [9].

 The state contends that the trial court may not be convicted of error for permitting the above argument, because after the court overruled defendant's objection, defendant did not request that the court take affirmative action such as a reprimand of state's counsel or declaration of a mistrial. In view of the court's ruling on his objection, defendant was not required to seek the affirmative action the state mentions; the ruling indicates such request would have been to no avail.

Defendant has briefed other assignments of error but because of the conclusion we have reached we need not discuss them.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial.

HOLMAN, FINCH, DONNELLY, JJ., and STONE, Special Judge, concur.

STORCKMAN, C. J., dissents in separate dissenting opinion filed.

EAGER, J., dissents.

HYDE, J., not sitting.

Dissenting Opinion

STORCKMAN, Chief Justice.

The testimony of Dr. James N. Haddock that the defendant could not be rehabilitated and if not restrained would commit other offenses in the future was unnecessary and improper, but I doubt if it was prejudicially erroneous in view of the nature of the defense and all the circumstances in the case. Moreover, I think the opinion unduly and unnecessarily restricts the argument to the jury that counsel for the state can make in this and other kinds of criminal prosecutions.

Therefore, I dissent.